*775 OPINION OF THE COURT
Louise Gruner Gans, J.
Petitioner Jean Doe, a 17-year-old biological male,[1] who has been diagnosed with gender identity disorder (GID) brings this CPLR article 78 petition seeking an order barring respondents, New York City Administration for Children’s Services and Commissioner William Bell (collectively hereinafter ACS), from preventing Doe from keeping and wearing skirts and dresses at the Atlantic Transitional Foster Facility, the all-male ACS-operated, 24 bed, congregate foster care facility in which she lives.[2] Doe contends that by denying her the right to wear such feminine clothing consistent with her gender identity, Atlantic Transitional’s policy constitutes unlawful disability and sex discrimination in contravention of the New York State Human Rights Law (Executive Law § 291 et seq.), and violates Doe’s constitutional right to freedom of expression.
Facts
Jean Doe is a 17-year-old teenager, who albeit with some interruptions, has been in foster care since age nine. Born a male, she identifies as a female. She experiences an intense need to wear women’s clothing and act as a woman. She feels uncomfortable dressing as a male, finding such dress awkward and alienating. Indeed, Doe has run away from prior foster care placements in which she was forced to dress like a man. This condition is known as gender identity disorder or GID. The American Psychiatric Association’s Diagnostic and Statistical Manual of Mental Disorders (4th ed 1994) (DSM-IV) recognizes GID as a mental disorder.[3] According to the DSM-IV, there are three components of GID: (i) “a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex” (at 532); (ii) “[tjhere must also be evidence of that persistent discomfort about one’s assigned sex or a sense of inappropriateness in the gender role of that sex” (at 533); and (iii) “clinically significant distress or impairment in social, occupational, or other important areas of functioning.” (Id.) Doe’s insistence on dressing in feminine *776 clothing is a characteristic of persons with GID. As noted in the DSM-IV, “[i]n boys, the cross-gender identification is manifested by a marked preoccupation with traditionally feminine activities. They may have a preference for dressing in girls’ or women’s clothes * * * .” (Id.) Dr. Spritz, a psychiatrist who had treated Doe, testified that she had diagnosed Doe with GID based on Doe’s self-identification as a woman and desire to wear women’s clothing, her discomfort in being forced to wear male clothing, and the distress she experienced when forced to do so.
Dr. Spritz testified that the treatment plan for Jean Doe called for Doe to dress according to her identity as a woman, including “wearing girls’ clothing, accessories, and makeup, and sometimes other items to make [herself] look * * * more feminine, such as breast enhancers.” Dr. Spritz explained the reason for such treatment: “[t]he goal is to facilitate acceptance of the gender identity of a transgendered person by allowing her to dress in a manner consistent with her internal identity * * * Research has found that forcing youths with GID to dress in conflict with their identity, though it may be in harmony with their biological attributes, causes significant anxiety, psychological harm, and antisocial behavior.” Her opinion was seconded by Gerald P. Mallon, Ph.D., a Professor at the Hunter College School of Social Work and founder of the Green Chimneys Children’s Services Program for, inter alia, transgendered youth, who expressed the opinion that “[t]he proper course of treatment for transgendered boys is to allow them to wear feminine clothing in an integrated environment.”
Since the time of Jean Doe’s second admission to Atlantic Transitional in January 2002, respondents have restricted the kinds of clothing she may wear. In March 2002, Wayne Antoine, director of Atlantic Transitional, issued a memorandum to the staff explaining that Jean Doe was not permitted “to wear ‘female attire’ in the facility. He can wear it only if he is walking directly out of the facility. If he returns to the facility, he must be escorted to his room so he can remove the female attire.” Despite its prohibition of all “female attire,” the memorandum stated that Doe would be allowed “to wear scarves, ‘nails’, brassieres, and enhancers.”[4] Later that month, after petitioner’s counsel complained to ACS that Ms. Doe was being denied the right to dress in a feminine manner, ACS, by letter *777 from its legal counsel unit dated March 28, 2002, refused to take any action to alter the Atlantic Transitional policy. ACS determined that because of its need to protect “the safety and welfare of the resident children, [Ms. Doe] is not permitted to dress in female clothing at his current group home.” ACS noted that it had previously placed Ms. Doe in two group homes for gay, lesbian, bisexual, and transgendered youth, both of which permitted her to wear women’s clothing, but that Doe had been discharged from both of these facilities for misconduct. Thus, according to ACS, “[b]ut for your client’s repeated and serious misconduct at these facilities, no issue of the denial of a claimed right to wear female clothing would even exist.” Jean Doe does have a history of being insubordinate, undisciplined, and on occasion has been involved in violent altercations during her sojourn through many foster homes, group homes and institutions.
On June 10, 2002, Doe brought this article 78 petition and moved for preliminary injunctive relief requiring ACS to allow Ms. Doe to wear the whole range of feminine clothing at Atlantic Transitional.[5] One month later, on July 18, 2002, with the participation and approval of ACS, Mr. Antoine issued a memorandum announcing new written dress standards for residents of Atlantic Transitional. It stated that residents “must wear pants, or in warm weather, loose-fitting shorts that extend at least to mid-thigh. Shirts (or blouses) must also be worn at all times and must not expose the chest or midriff.” The July 18 memorandum further prohibits Atlantic residents from wearing “clothing that is sexually provocative, that is, excessively short or tight fitting, or which is see thru.” As part *778 of the standards, “[Residents who wish to wear female attire may do so as long as the above guidelines are respected. Female attire that does not conform to the policy may only be worn b; a resident when leaving facility premises. Residents whose attire does not conform to these guidelines must be immediately sent to their rooms to change.” Thus, residents at Atlantic Transitional are not permitted to wear skirts or dresses at the facility. At the same time, Atlantic Transitional has continued to permit Jean Doe to wear scarves, “nails,” breast enhancers and brassieres, hair weaves (a kind of hair lengthening hairpiece), and makeup.
Discussion
The New York State Human Rights Law (Executive Law § 296 [18] [2]) provides that it is “an unlawful discriminator practice for the owner, lessee, sub-lessee, assignee, or manag ing agent of, or other person having the right of ownership of or possession of or the right to rent or lease housing accommodations * * * [t]o refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling.” (See also Executive Law § 296 [2-a] [d] [2] [forbidding the “owner * * * of publicly-assisted housing accommodations * * * (from) refus(ing) to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling”].)
A. Is Jean Doe Disabled Under the State Human Rights Law?
Under the State Human Rights Law, the term “disability” is broadly defined. Disability “means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.” (Executive Law § 292 [21].) Doe argues that, under this broad definition, she is a person with a disability, namely, GID. The court agrees.
In State Div. of Human Rights v Xerox Corp. (65 NY2d 213 [1985]), the Court of Appeals held that an obese employee was a disabled employee who could not be terminated based on her disability under the State Human Rights Law. In rejecting the employer’s argument that an employee could not be considered disabled under the State Human Rights Law absent a showing *779 that her impairment limited his or her ability to perform particular activities, the Court of Appeals focused on New York’s broad statutory definition of disability:
“[The employer’s] arguments might have some force under typical disability or handicap statutes narrowly defining the terms in the ordinary sense to include only physical or mental conditions which limit the ability to perform certain activities * * * . However in New York, the term ‘disability’ is more broadly defined. The statute provides that disabilities are not limited to physical or mental impairments but may also include ‘medical impairments.’ In addition, to qualify as a disability, the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function or (2) by being ‘demonstrable by medically accepted clinical or diagnostic techniques % * * 5
“Fairly read, the statute covers a range of conditions varying in degree from those involving the loss of a bodily function to those which are merely diagnosable medical anomalies which impair bodily integrity and thus may lead to more serious conditions in the future.” (Id. at 218-219.)
Based on this definition, the Court of Appeals held that the Commissioner of the State Division of Human Rights “could find that the complainant’s obese condition itself, which was clinically diagnosed, * * * constituted an impairment and therefore a disability within the contemplation of the statute.” (Id. at 219; see also Reeves v Johnson Controls World Servs., Inc., 140 F3d 144, 155-156 [2d Cir 1998] [holding that, under Xerox, plaintiffs panic disorder was a disability under the State Human Rights Law] [“(Xerox’s) literal reading of the statute * * * treats a medically diagnosable impairment as necessarily a disability for purposes of the NYHRL. ‘Thus, an individual can be disabled under the (NYHRL) if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual’s normal activities’ ”], quoting Hazeldine v Beverage Media, Ltd., 954 F Supp 697, 706 [SD NY 1997].)
Under Xerox and Reeves, Doe’s GID is a disability under the State Human Rights Law. Doe’s disorder has been clinically diagnosed by Dr. Spritz, as well as by Dr. Levin of the Family Court Mental Health Services, using the medically accepted standards set forth in the DSM-IV. No more is required for *780 Doe to be protected from discrimination under the State Human Rights Law. (See Reeves, 140 F3d at 156 [“(W)e find that plaintiffs medically diagnosed Panic Disorder With Agoraphobia constitutes a disability within the meaning of the NYHRL”].)[6]
B. Does Atlantic Transitional’s Dress Policy Discriminate Against Jean Doe?
Doe argues that the dress code barring her from wearing feminine clothing, such as dresses and skirts, violates the State Human Rights Law because (i) it discriminates against her based on disability, and (ii) the city failed to make reasonable accommodations for Doe’s disability.
Doe’s first argument is without merit. There is nothing in the Atlantic Transitional policy that discriminates against Doe or other persons with disabilities based on her disability. The policy is neutral on its face and applies to all persons at the facility who wish to wear feminine clothing, whether or not they suffer from GID. The policy does not target persons who have GID and there is nothing in the record to suggest that the dress policy was promulgated to subject persons with disabilities to adverse treatment.
The State Human Rights Law, of course, is not simply a prohibition on discriminatory actions taken because of a person’s disability. Quite the contrary, the State Human Rights Law, like federal disability discrimination statutes, requires covered entities to provide to persons with disabilities reasonable accommodations not offered to other persons in order to ensure that persons with disabilities enjoy equality of opportunity. (See Executive Law § 296 [18] [2] [requiring provision of reasonable accommodations in rules, policies, and practices “when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling”]; Matter of United Veterans Mut. Hous. No. 2 Corp. v New York City Commn. on Human Rights, 207 AD2d 551, 552 [2d Dept 1994] [finding unlawful co-op’s policy of refusing to expend corporate funds on providing reasonable accommodations to disabled residents]; see also US Airways, Inc. v Barnett, 535 US 391, 397 [2002] [“The Act requires preferences in the form of ‘reasonable accommodations’ that are needed for those with disabilities to obtain the same workplace opportunities that *781 those without disabilities automatically enjoy. By definition any special ‘accommodation’ requires the employer to treat an employee with a disability differently, i.e., preferentially”].)[7]
For example, in Ocean Gate Assoc. Starrett Sys. v Dopico (109 Misc 2d 774 [Civ Ct, Kings County 1981]), the court refused to grant a landlord summary judgment terminating disabled tenants’ lease for keeping a dog in violation of the no pet clause in the lease. The court held that the landlord would be required to make a reasonable accommodation to a disabled tenant who needed to keep a pet because of that person’s disability. “[T]he legislative advances protecting the disabled * * * require the no-pet clause to bow upon proof of a specific, particularized need to keep a dog, which need arises out of the handicap.” (Id. at 775; see also Crossroads Apts. Assoc. v LeBoo, 152 Misc 2d 830 [Rochester City Ct 1991] [refusing to grant a judgment evicting a disabled person based on no pet clause where tenant claimed that pet was necessary to assist tenant in dealing with mental illness].)
In Dopico, respondents were wheelchair bound tenants, for whom a dog was necessary for the enjoyment of the property. The dogs helped keep the disabled tenants safe and also helped them detect smoke and fire. Without the dogs, the tenants would be subject to an unnecessary risk of harm. To allow the disabled tenants the full and equal freedom to use their dwelling, the court ruled, the landlord had to accommodate the disabled tenants by exempting them from the lease’s no pet clause.
Accordingly, the question is whether the city discriminated against Jean Doe by failing to accommodate her disability by exempting her from Atlantic Transitional’s dress policy forbidding the wearing of dresses and skirts within the facility. In other words, does this case fall within the duty to provide reasonable accommodations outlined in Dopico?
The text of the State Human Rights Law sheds considerable light on the meaning of the duty to provide reasonable accom *782 modations in rules, procedures, and policies. First, a covered entity has an obligation to provide reasonable accommodations in the rules, procedures, and practices of a housing facility “when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling.” (Executive Law § 296 [18] [2].) Thus, persons with disabilities are entitled to accommodations from generally applicable rules that limit their ability to enjoy the use of a dwelling on the same terms as nondisabled persons. For example, in Dopico, the reasonable accommodation ensured that a disabled tenant would not be victimized because of the individual’s disability. Thus, by providing disabled persons with the right to have a dog, the accommodation sought to grant wheelchair bound disabled tenants the security enjoyed by nondisabled tenants.
Section 292 (21-e) further defines the term “reasonable accommodation.” That section provides that “reasonable accommodation” means “actions taken which permit an employee, prospective employee or member with a disability to perform in a reasonable manner the activities involved in the job or occupation sought or held * * * ; provided, however, that such actions do not impose an undue hardship on the business, program or enterprise of the entity from which the action is requested.” (Executive Law § 292 [21-e].) This section tells us that a covered entity need not offer all accommodations sought by an individual with a disability. If the proposed accommodation would pose an undue hardship on the entity or is otherwise unreasonable, no liability arises from the failure to provide it.
In Barnett, the United States Supreme Court set out a burden-shifting scheme for reasonable accommodation cases. Plaintiff generally bears the burden of proving that the proposed accommodation “seems reasonable on its face, i.e., ordinarily or in the run of cases.” (Barnett, 535 US at 401; see also 535 US at 409-410 [O’Connor, J., concurring].) If plaintiff makes this showing, the burden shifts to the defendant to show that the accommodation, though reasonable as a general matter, imposes an undue hardship on the defendant due to the defendant’s particularized circumstances. (Id. 535 US at 401.)
As Dopico shows, the New York case law makes clear that exempting a disabled person from a generally applicable regulation is a reasonable accommodation where there is a particularized showing of need for that exemption arising from the individual’s disability. For example, in Dopico, the court *783 found that a disabled tenant who was confined to a wheelchair was entitled to keep a dog in violation of a no pet clause “upon proof of a specific, particularized need to keep a dog, which need arises out of the handicap.” (Dopico, 109 Misc 2d at 775.)
Based on the record before the court, the court concludes that exempting Jean Doe from the Atlantic Transitional dress policy is a reasonable accommodation. The record establishes that, because of her GID and the treatment she has been receiving for her condition, Jean Doe needs to be able to wear feminine clothing, including dresses and skirts now banned under the ACS-approved dress policy. The evidence before the court establishes that, because of her disability, Jean Doe experiences significant emotional distress if denied the right to wear such feminine clothing. Indeed, the treatment she has received for her GID calls for her to wear feminine clothing, including dresses and skirts. Granting her an exemption from the dress policy avoids this psychological distress. Moreover, it allows Ms. Doe the equal opportunity to use and enjoy the facilities at Atlantic Transitional — a right that would be denied to her if forced to endure psychological distress as a result of the ACS’ dress policy. As in Dopico, because of this particularized showing of need, the exemption is a reasonable one.
The only difference between this case and Dopico is that Doe seeks an accommodation because the ACS dress policy conflicts with her GID and the psychological treatment she is receiving, whereas the tenant in Dopico needed an accommodation because the no pet clause conflicted with the tenant’s physical limitations, depriving the tenant of the security a guard dog could bring. That Dopico involved a physical disability and this case a mental disability is, of course, of no moment. The State Human Rights Law protects both kinds of disabilities and requires the provision of reasonable accommodations to both physically and emotionally disabled persons.
ACS concedes that the State Human Rights Law applies to the policies it enacts for the foster care residents in its custody, but denies any failure to make a required reasonable accommodation. It makes three separate arguments in an attempt to avoid the conclusion that it failed to make a reasonable accommodation to Jean Doe’s disability.
First, ACS asserts that it did not know that Jean Doe was disabled, and thus was not aware of the need to provide an accommodation to her. This argument requires little comment. The record evidence leaves no doubt that respondents were aware of Jean Doe’s condition. Respondents knew that she *784 needed to wear feminine clothing. Indeed, because she did so, in March 2002, both Atlantic Transitional and ACS announced their policy forbidding the wearing of skirts and dresses as items of feminine clothing at Atlantic Transitional. Yet this was the very time, when on March 7, 2002, Family Court Mental Health Services’ evaluation of Jean Doe included the diagnosis “302.85 Gender Identity Disorder, in Adolescence.” The diagnosis was contained in a report prepared in connection with the Family Court proceeding before Judge Rand, in which ACS and Atlantic Transitional participated. Moreover, respondents were aware of Ms. Doe’s prior placement through ACS in foster care facilities designed for children who are gay, lesbian, bisexual or transgendered. Finally, Jean Doe testified at the preliminary injunction hearing that she specifically informed Mr. Antoine that her need to wear feminine clothing stemmed from her GID and treatment she was receiving for GID. Respondents failed to offer any evidence specifically controverting this testimony. Respondents’ assertion that they were unaware of Jean Doe’s disability is wholly unpersuasive.
Second, ACS argues that it has provided a limited accommodation to Jean Doe, permitting her to wear certain feminine clothing, i.e., blouses, makeup, and augmented breasts, and that any broader accommodation would be unreasonable because it would jeopardize the safety of the residents and staff of Atlantic Transitional. In short, ACS asserts that Ms. Doe’s request to wear the range of feminine clothing at the facility would not be a reasonable accommodation because it would threaten the safety and security of the institution.[8]
It is, of course, well established that a disabled person is not entitled to an accommodation that would jeopardize the health and well-being of others. (Cf. Chevron U.S.A. Inc. v Echazabal, 536 US 73 [2002] [upholding regulation authorizing refusal to hire disabled employee where worker’s disability on the job would pose a direct threat to himself and others].) At the same time, courts must be wary of adverse treatment visited on persons with disabilities based on a need to protect others from them, lest overbroad generalizations about a disability be used as justification for discrimination.
In School Bd. of Nassau County, Fla. v Arline (480 US 273 [1987]), the Supreme Court considered whether, under section 504 of the Rehabilitation Act, a disabled school teacher who *785 suffered from tuberculosis could be fired because she had a contagious disease. The Court refused to carve out an exception to federal disability discrimination law because the employee suffered from a contagious disease. “Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with the basic purpose of § 504, which is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.” (Id. at 284.) The Court directed lower courts to make an individualized inquiry to determine whether a disabled person posed a direct threat to others. “Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.” (Id. at 287.)
ACS asserts that its dress policy is necessary to protect the safety of residents and staff. According to Dr. Antoine, it was necessary to restrict the kind of dress worn by Jean Doe because a male in feminine clothing creates a “sexual dynamic * * * that can lead to unsafe and emotionally harmful sexual behavior.” Further, at the facility, “there are many boys who are not emotionally mature and who feel confused or threatened by the presence of a transgendered boy among them and are prone to act out when Jean is nearby.”
The court is not persuaded that Mr. Antoine’s concerns render the accommodation sought by Jean Doe an unreasonable one. The premise of respondents’ argument is that cross-dressing by a resident can lead to unsafe sexual behavior and other inappropriate conduct. But respondents permit Jean Doe to wear a number of different kinds of feminine clothing without jeopardizing the safety of the facility and its residents. As respondents freely admit, Jean Doe is allowed to wear fake breasts, makeup, women’s blouses, scarves, nails, hair weaves and other female clothing while at Atlantic Transitional. Respondents cannot explain why she may safely wear these feminine items of clothing and accessories, but may not wear skirts or dresses without endangering the safety of the facility and its residents.[9] “As a means of pursuing the objective of [safety] that respondents now articulate, the [dress policy] is so *786 woefully underinclusive as to render belief in that purpose a challenge to the credulous.” (Republican Party of Minn. v White, 536 US 765, 780 [2002].) There is simply no rational basis for treating dresses and skirts differently than the other feminine acoutrements which Jean Doe may now wear. In these circumstances, the city’s purported safety concerns provide no basis for rejecting Doe’s accommodation as unreasonable.[10]
Third, respondents point to the fact that the city previously placed Doe in foster care facilities designed for gay, lesbian, bisexual, and transgendered youth — facilities in which there were no restrictions on Doe’s right to dress in a feminine manner — and that Doe was ejected from these facilities because of her own misconduct. Respondents claim that because Doe was ejected from these facilities, she should not be heard to complain about Atlantic Transitional’s dress policy. The court disagrees. The ACS’ obligation to act in a nondiscriminatory fashion is not satisfied merely by providing a small number of facilities at which children with GID are assured nondiscriminatory treatment. At each and every facility run and operated by the ACS, it must comply with the Human Rights Law’s mandate to provide reasonable accommodations to persons *787 with disabilities. That Doe engaged in misconduct that led to her expulsion from the foster care facilities designed for gay, lesbian, bisexual, and transgendered youth gives ACS no license to discriminate against her by denying her a reasonable accommodation.
Accordingly, the court finds that respondents have refused to accommodate reasonably Doe’s GID in violation of the New York State Human Rights Law. Doe is therefore entitled to relief in the form of an exemption from respondents’ dress policy, to the extent it bars her from wearing skirts and dresses at the Atlantic Transitional congregate foster care facility. Because the court finds that Doe is entitled to relief on her disability discrimination claim, the court need not reach her alternative bases for relief.
Accordingly, the petition of Jean Doe is granted. Petitioner’s motion for a preliminary injunction is permitted to be withdrawn.

. Although biologically male, Doe identifies as a woman. Based on this identity, the parties have used feminine pronouns to refer to her. The court does so as well.

. Atlantic Transitional is an all-male congregate care facility used by ACS for short-term placement of boys in foster care aged 15 to 21. Generally, boys will stay at Atlantic Transitional only for a period of 30 to 40 days or until a permanent placement is found. Where there are difficulties in finding a suitable permanent placement, as has been the case with Jean Doe, a resident may stay at Atlantic Transitional for a longer period.

. Gender identity disorder was first listed in DSM-III in 1980.

. Respondents do not dispute that the memorandum concerned Jean Doe and the clothing she would be permitted to wear in the Atlantic Transitional facility.

. This court held a hearing on Doe’s motion for a preUminary injunction on August 12, 2002, and heard testimony from both parties at the hearing. On November 15, 2002, Doe withdrew her request for interim relief, but requested that the court rule on the merits based on the entire record, including the testimony and written submissions presented in support of the motion for a preliminary injunction. On December 26, 2002, the court issued an order giving ACS an opportunity to respond to Doe’s request, and to offer additional evidence. On January 3, 2003, Corporation Counsel responded by letter, enclosing as additional evidence the following documents related to Jean Doe: a copy of ACS’ April 16, 2002 letter to Family Court Judge Sheldon M. Rand, the transcript of an April 19, 2002 hearing before Judge Rand, and a March 7, 2002 Family Court Mental Health Services clinical report prepared for the case before Judge Rand. On January 6, 2003, Doe’s counsel advised that there was no objection to these submissions. Accordingly, these submissions, as well as the evidence taken at the hearing and the documents submitted in support of and in opposition to the motion for a preliminary injunction, are deemed to be part of the record, and will be considered by the court in ruling on the merits of the petition.

. Although ACS refuses to concede that GID is a disability under the State Human Rights Law, it offers no argument that Doe is not disabled under the State Human Rights Law.

. As a general matter, the scope of the disability discrimination provisions of the State Human Rights Law are similar to those of the Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act of 1973 (29 USC § 794 [a]), a precursor to the ADA. (See Reeves, 140 F3d at 154-156 [noting legislative history calling for coextensive interpretation of state and federal disability discrimination statutes, but interpreting State Human Rights Law to be more protective based on different statutory definition].) For this reason, absent a difference in statutory text or state court authority interpreting state law more broadly, the Supreme Court’s interpretation of the ADA and section 504 is persuasive authority here.

. Respondents frame this argument in terms of the reasonableness of Doe’s accommodation. They do not argue that the accommodation, if reasonable, would pose an undue burden.

. Moreover, the altercations involving Jean Doe of which ACS complains occurred when she was not wearing a skirt or dress. The problems presented by Jean Doe’s deportment are separate from her dress. (See, Doe ex rel. Doe v Yunits, 2000 WL 33162199, 2000 Mass Super LEXIS 491.)

. To support their argument that their dress policy does not offend the State Human Rights Law, the city relies on Matter of New York City Hous. Auth. Tenant Selection Div. v State Human Rights Appeal Bd. (59 AD2d 742 [2d Dept 1977]) and Matter of Custodio v Popolizio (139 Misc 2d 391 [Sup Ct, NY County 1987]). In Tenant Selection, the Appellate Division upheld the city’s denial of eligibility for housing to a disabled person because the tenant “could well be a menace to the elderly and disabled tenants with whom she would reside.” (59 AD2d at 744.) Based on the prospective tenant’s long history of destructive and other inappropriate behavior, the Court found no evidence to support the conclusion that the denial was based on the tenant’s disability. In Custodio, the court held that the city’s housing authority was entitled to consider information relating to a tenant’s disability in deciding whether that tenant could be placed in public housing. Because the city could deny housing to a tenant who caused substantial disturbance to others, the court held that the city was entitled to information regarding the proposed tenant’s disability to determine if the tenant could meet the standards of conduct reasonably required of tenants. (Custodio, 139 Misc 2d at 392-393.) These cases are inapposite here. Although the city does point out that Ms. Doe caused some disturbances at Atlantic Transitional, the city does not seek to exclude Ms. Doe from housing. The question here is whether the city can restrict Jean Doe’s wearing of certain feminine clothing based on its claim that such clothing will jeopardize the institutional safety of Atlantic Transitional. For the reasons explained above, the city’s safety justification fails because there is no rational distinction, in terms of institutional safety, between the feminine clothing permitted and that banned under the city’s policy.