# STATE OF MICHIGAN

# COURT OF APPEALS

DONNA WALKER, WILLIAM WALKER, and
HEAD TO TOES MASSAGE THERAPY OF
OXFORD, INC.,

        Plaintiffs-Appellants,

v

OTIS M. UNDERWOOD, JR.,

        Defendant-Appellee.

UNPUBLISHED
September 7, 2017

Nos. 332129
Oakland Circuit Court
LC No. 2015-145545-CK

DONNA WALKER, WILLIAM WALKER, and
HEAD TO TOES MASSAGE THERAPY OF
OXFORD, INC.,

        Plaintiffs-Appellees,

v

OTIS M. UNDERWOOD, JR.,

        Defendant-Appellant.

No. 333160
Oakland Circuit Court
LC No. 2015-145545-CK

Before: SHAPIRO, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

The parties signed a letter agreement regarding a building owned by defendant Otis M. Underwood, Jr. Underwood, an attorney, drafted the document. The contract provided that Underwood would build out part of the premises for plaintiffs' use as the new location of their spa business, and would "use all reasonable efforts/expense to obtain a final occupancy permit of [sic] the building." Nine months later, plaintiffs informed Underwood that they could wait no longer for him to complete the work necessary for an occupancy permit. They filed suit alleging breach of contract and fraudulent misrepresentation.

The circuit court granted summary disposition in Underwood's favor, ruling that the "sole remedy" permitted by the letter agreement was for the aggrieved party "to declare a default

-1-

and terminate this preliminary agreement to lease," unless the parties agreed otherwise. We read the contractual language differently, and reverse this ruling.[1] The circuit court denied Underwood's motion for sanctions; we affirm that decision.

I

We review de novo the circuit court's summary disposition ruling. *Moser v Detroit*, 284 Mich App 536, 538; 772 NW2d 823 (2009). The primary question presented in this case is whether the following paragraph of the letter agreement precluded plaintiffs from filing this lawsuit:

> 10. The failure of either party to perform the preliminary duties outlined in this agreement will permit the obligee of the duty to declare a default and terminate this preliminary agreement to lease or other remedy that may be agreed to by the parties.

We also review de novo the lower court's interpretation of the contract underlying the action. *Citizens Ins Co v Secura Ins*, 279 Mich App 69, 72; 755 NW2d 563 (2008). We interpret contractual language according to its plain and ordinary meaning. *Holmes v Holmes,* 281 Mich App 575, 594; 760 NW2d 300 (2008).

> Under ordinary contract principles, if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations, factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. The language of a contract should be given its ordinary and plain meaning. [*Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997) (citations omitted).]

"It is an elementary rule of construction of contracts that in case of doubt, a contract is to be strictly construed against the party by whose agent it was drafted." *Shay v Aldrich*, 487 Mich 648, 673; 790 NW2d 629 (2010).

We turn to the sentence comprising paragraph 10 of the contract. Plaintiffs are the "obligee" referred to in the sentence, which consists of two clauses that we re-present separately here:

> The failure of either party to perform the preliminary duties outlined in this agreement will permit [plaintiffs] to declare a default and terminate this preliminary agreement to lease

---

[1] The circuit court summarily dismissed plaintiffs' fraudulent misrepresentation claim on an alternate ground. Plaintiffs have abandoned any appeal of that ruling.

or other remedy that may be agreed to by the parties.

The first clause is independent and straightforward. It has a subject and a future tense verb: "will permit." The verb "permit" means the same things as "allow."[2] Alternatively stated, the first clause states that the nonbreaching party is allowed to declare a default and terminate the preliminary agreement to lease.

The second clause, however, lacks a verb. Although this clause is unartfully worded, it makes sense to assume that the drafter (Underwood) intended that the same verb form ("will permit") would apply, and that Underwood inadvertently omitted the verb. Reasonably interpreted, this clause "fairly admits of but one interpretation": that the nonbreaching party is allowed to pursue any other remedy agreed upon by the parties.

The circuit court interpreted these clauses to mean that in the event of a breach of the agreement, the parties agreed to confine themselves to either of the two remedies specifically mentioned: declaring a default and terminating the preliminary agreement to lease, or agreeing on some alternate remedy. The problem with this construction of the paragraph is that it requires the insertion of a word or words limiting the available remedies for breach to those specified. We decline to rewrite the parties' contract by adding a concept neither identified nor fairly inferable from the words actually used.[3] As the drafter and an attorney, Underwood was undoubtedly aware of the bedrock legal principle that contractual vagaries are construed against the drafter. Most likely he was also familiar with the concept of an exclusive remedy. The absence of language to that effect, coupled with the permissive tone of paragraph 10, persuades us that Underwood did not intend that the remedies mentioned would constitute the sole remedies available to either side.

Had Underwood meant to make the remedies mentioned in paragraph 10 exclusive, he could have done so simply by adding some language of limitation or restriction regarding the available remedies for breach. Here are three examples:

---

[2] *The Merriam-Webster Collegiate Dictionary* (11th ed, 2014), p 923, defines "permit" as: "1: to consent to expressly or formally . . . 2: to give leave: AUTHORIZE 3: to make possible . . . vi : to give an opportunity : ALLOW."

[3] We reject the notion that the *expressio unius est exclusio alterius* canon counsels in favor of reading the two described remedies as exclusive. "[T]he canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v Peabody Coal Co*, 537 US 149, 168; 123 S Ct 748; 154 L Ed 2d 653 (2003). "The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand." *Chevron USA, Inc v Echazabal*, 536 US 73, 80-81; 122 S Ct 2045; 153 L Ed 2d 82 (2002). The two remedies listed are hardly so similar that they "go hand in hand." And given the use of the verb "permit" in conjunction with the two remedies mentioned, we must assume that the drafter intended an expansive rather than a limited realm of remedies.

10.     The failure of either party to perform the preliminary duties outlined in this agreement will permit the obligee of the duty **either** to declare a default and terminate this preliminary agreement to lease or **an**other remedy that must be agreed to by the parties.

or

10.     The failure of either party to perform the preliminary duties outlined in this agreement will permit the obligee of the duty **only** to declare a default and terminate this preliminary agreement to lease or other remedy that may be agreed to by the parties.

Or

10.     The failure of either party to perform the preliminary duties outlined in this agreement will permit the obligee of the duty to declare a default and terminate this preliminary agreement to lease or other remedy that may be agreed to by the parties. **No other remedies are permitted.**

We highlight that the verb chosen by Underwood—"permit"—suggests permission or acquiescence rather than prohibition or preclusion. Despite that the parties did not agree on a remedy or declare the default, nothing in this paragraph (or any other part of the agreement) provides that the two options mentioned were the only or sole remedies available. And "we may not read into the contract terms not agreed upon by the parties." *Trimble v Metro Life Ins Co*, 305 Mich 172, 175; 9 NW2d 49 (1943) (quotation marks and citation omitted).

We find additional support for our conclusion in *Short v Hollingsworth*, 291 Mich 271; 289 NW 158 (1939), a breach-of-contract action arising from the installment sale of the plaintiff's corporate stock to the defendants. The contract provided in relevant part, "If and in the event the buyers shall fail to make any installment payment on the date specified the sellers may, at any time after any installment payment is past due for ninety days, file a written request with said bank to return said stock to them[.]" *Id*. at 272. When the buyer-defendants defaulted on the fourth payment, the plaintiff brought an action to recover the balance of the contract price with interest. The defendants argued that the remedy set forth in the contract (return of the stock) was exclusive, and that the plaintiff could not bring a breach-of-contract action seeking the balance of the purchase price. *Id*. at 273. The Supreme Court held that the language of the contract did not evince an intent to limit the remedies available for breach, as the parties used the word "may" to describe one remedy, while elsewhere in the contract they used the word "shall" regarding other aspects of the agreement:

The intention of the parties, we believe, from a reading of the entire contract and a consideration of all the circumstances, was not that the remedy expressed for defendants' breach should be exclusive. Although defendant earnestly argues to the contrary, it is significant that the remedy provided upon breach is made available in permissive language by the use of the word "may", whereas, other covenants expressed therein, creating obligations upon both parties, are imposed in mandatory language by the use of the word "shall".

Typical of phrases appearing throughout the contract are: "the buyers *shall* pay"; "the stock so purchased * * * *shall* be deposited"; "annual installments * * * *shall* be paid"; "said bank *shall* make distribution of such payments". The use of the word "shall" appears throughout the contract as the choice of the parties in imposing the obligations assumed thereunder with but few exceptions, one being the provisions, that in the event of default the sellers *may* pursue the remedy hereinbefore quoted. [*Id*. at 274 (emphasis in original).]

The Court held that the contractual language did not "indicate an intent to provide an exclusive remedy[.]" *Id*. at 274-275. "The words used in the contract should be construed according to their ordinary meaning unless it is clear that a different meaning was intended, and we find nothing that would authorize us to construe the word *may*, used as aforesaid, as meaning *shall*." *Id*. at 275 (emphasis in original).

Here, the contract used the term "permit" rather than "may." This is a distinction lacking a meaningful difference; both words suggest permission, not restraint. As in *Short*, other paragraphs in the parties' letter agreement demonstrate that the parties used stronger language, indicative of compulsion, elsewhere. For example, paragraph 7 states:

The Lease (form included as part of this agreement) **will be signed** for an initial 3 year term (and use of basement for storage, etc.)[.] A monthly rental of $1,700, paid in advance, plus, the payment at signing, a $2,000 security deposit as well as a refund of any costs advanced by Landlord in the build out to begin occupancy. [Emphasis added.]

Paragraph 9 provides:

Tenant agrees that at the lease signing they **will have procured** liability insurance naming landlord as additional insured in the minimum amount of $1 million/$3 million per occurrence, for liability coverage. Tenant is also responsible for insuring against loss of the glass windows, its own furniture and fixtures/appliances and inventory. Landlord insures the building for liability claims made against him as well as his risk of loss from fire, and other hazards. [Emphasis added.]

The use of this mandatory language signals to us, as it did the Supreme Court in *Short*, that the parties knew how and when to use words compelling an action, and chose language of permission rather than obligation to describe available remedies. Accordingly, we reverse the circuit court's grant of summary disposition to Underwood, and remand for further proceedings.

II

In a cross appeal, Underwood argues that the circuit court erred in denying his motion for sanctions. We review a trial court's finding whether an action is frivolous for clear error. *Kitchen v Kitchen*, 465 Mich 654, 661; 641 NW2d 245 (2002). "A decision is clearly erroneous where, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *Id*. at 661-662.

-5-

The circuit court did not err by denying sanctions. Given our resolution of plaintiffs' appeal, their breach of contract claim must proceed toward trial. And Underwood has presented no caselaw holding that plaintiffs were precluded from bringing a fraudulent misrepresentation action. Plaintiff's' decision to jettison this portion of their case does not render it frivolous. See *Louya v William Beaumont Hosp*, 190 Mich App 151, 164; 475 NW2d 434 (1991) ("The ultimate outcome of the case does not necessarily determine the issue of frivolousness.").

We reverse in part, affirm in part, and remand for further proceedings. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher