**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**BURLINGTON NORTHERN & SANTA FE RAILWAY CO., Defendant.**

**Case No. 07–2450.**

United States District Court, W.D. Tennessee, Western Division.

June 3, 2009.

---

Deidre Smith, Faye A. Williams, Steven W. Dills, Equal Employment Opportunity Commission, Memphis, TN, for Plaintiff.

Bryan P. Neal, Stephen F. Fink, Thompson & Knight, Dallas, TX, Lawrence M. Stroik, Burlington Northern Railroad Company, Fort Worth, TX, Ralph

T. Gibson, Bateman Gibson & Childers, Memphis, TN, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SAMUEL H. MAYS, JR., District Judge.

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action against Defendant Burlington Northern & Santa Fe Railway Co. ("BNSF") on behalf of Emerson Payne[1] ("Payne") for employment discrimination in violation of Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111, *et seq.*, and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981. Before the Court is BNSF's September 15, 2008 motion for summary judgment. EEOC responded on October 15, 2008, BNSF replied on November 18, 2008, and, with leave of the Court, EEOC filed a sur-reply on November 28, 2008. For the following reasons, BNSF's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

### I. Background

The following facts are undisputed unless otherwise noted. Payne was hired as a train conductor at BNSF's Memphis, Tennessee train yard on March 19, 2001. (Compl. ¶ 8.) Around March 23, 2003, Payne was involved in a motorcycle accident that resulted in the amputation of his right leg below the knee. (*Id.* ¶ 9.) Immediately following the injury, and for a short time afterwards, Payne was unable to walk. (Def.'s Statement of Undisputed Facts Supp. Summ. J. ¶ 8.) ("Def.'s SOF")

---

1. The EEOC, as a federal agency charged with the administration, interpretation, and enforcement of Title I of the ADA, is authorized to sue on Payne's behalf under Section 107(a) of the ADA. 42 U.S.C. § 12117(a).

Payne was fitted for and began using a prosthetic limb. (*Id.* ¶ 7.) BNSF placed Payne on an approved medical leave of absence, and he has remained on leave ever since. (*Id.* ¶ 8.)

Throughout 2003, Payne's physicians submitted to Continuum, the company with which BNSF contracts to process medical forms, a number of BNSF Medical Status Forms. (Def.'s SOF ¶ 9.) Each of those forms contained restrictions that prevented Payne from performing some or all of the essential duties of a conductor. (*Id.*)

On January 19, 2004, Payne's doctor released him to return to work with no restrictions. (Compl. ¶ 10.) Payne sent letters to several management officials at BNSF requesting clearance to return to work. (Pl.'s Resp. to Def.'s Statement of Undisputed Facts Supp. Summ. J. ¶ 8) ("Pl.'s SOF") BNSF had its medical department conduct a fitness-for-duty evaluation to determine Payne's status. (Def.'s SOF ¶ 13.)

Amanda Gambrell ("Gambrell"), BNSF's Director of Field Clinical Operations and a member of BNSF's medical department, determined that Payne should not be allowed to return to work as a train conductor. (Def.'s SOF ¶ 14.) EEOC alleges that Gambrell based her decision on Payne's record of past disability and her perception of him as disabled. (Pl.'s SOF ¶ 14.) BNSF disputes this fact, claiming that Gambrell determined Payne would present a risk of serious injury or death to himself and to his coworkers if he returned to work as a conductor. (Def.'s SOF ¶ 14.) EEOC sues BNSF on Payne's behalf, alleging that Defendant discharged Payne because of his disability, depriving him of equal employment opportunities in violation of the ADA. (Compl. ¶ 12.)

## II. Jurisdiction

This Court has jurisdiction over an ADA claim under 28 U.S.C. § 1331.

## III. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the evidence and the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party may not oppose it by mere reliance on the pleadings. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Rather, it must present some "specific facts showing that there is a genuine issue for trial." *Id.* A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present "concrete evidence supporting ... [its] claims." *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). The

district court does not have the duty to search the record for such evidence. *See InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 110–11 (6th Cir.1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in its favor. *See id.*

## IV. Analysis

■ To recover on a claim of discrimination under the ADA, "a plaintiff must show that: (1) he is an individual with a disability; (2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and (3) he was discharged solely by reason of his handicap." *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1178 (6th Cir.1996). The ADA defines a "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2).[2] An impairment "substantially limits" if it "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002); *see also* 29 C.F.R. § 1630.2(j).

This case is not one of actual disability because EEOC contends that Payne's amputation does not substantially limit any of his major life activities. EEOC asserts

that Payne's prosthesis would allow him to return to work as a train conductor without any special accommodation.[3] Thus, EEOC must prove either that BNSF regarded Payne as having a disability or that Payne has a record of a disability.

### A. "Regarded–As" Disability

■ A plaintiff can recover under the "regarded-as" prong of the ADA if he can show that the employer: (1) mistakenly believes that the plaintiff has a physical impairment that substantially limits one or more major life activities; or (2) mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Sutton,* 119 S.Ct. at 2149–50. "It is not enough … that the employer regarded the individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA," or as "actually" disabled. *Ross v. Campbell Soup Co.,* 237 F.3d 701, 709 (6th Cir.2001) (quoting *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998)). The question is one of the intent of the employer. *Ross,* 237 F.3d at 706. The Sixth Circuit has recognized that "that question—i.e., the employer's motive—is one rarely susceptible to resolution at the summary judgment stage." *Id.* EEOC argues that BNSF mistakenly believes that Mr. Payne's non-limiting impairment substantially limits the major life activities of walking and working. (Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. 4–7.) ("Pl.'s Resp.")

2. Any one of the three types of disabilities can support an ADA claim. The three types are often referred to as "actual disability," "record-of disability," and "regarded-as disability." *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2144, 144 L.Ed.2d 450 (1999).

3. Although the ADA Amendments Act of 2008 prohibits considering any ameliorative effect such as a prosthesis in determining actual disability, the Act did not become effective until January 1, 2009, and it does not apply retroactively to the conduct at issue in this case.

### 1. Regarded as Substantially Limited in Walking

EEOC argues that BNSF believes that Payne is substantially limited in walking because it believes that he lacks proprioception[4] in his amputated limb. (Pl.'s Resp. 4.) BNSF replies it does not view Payne as limited in his general ability to walk, but "believes that Payne cannot safely perform the unique type of walking (and other activities) that have to be done in a conductor job." (Def.'s Reply in Supp. of Mot. for Summ. J. 6.) ("Def.'s Reply")

█ It is undisputed that BNSF believes that Payne lacks proprioception in his amputated limb because it believes that his prosthetic is unable to replicate proprioception. (Def.'s SOF 16–17.) The alleged distinction between being substantially limited in walking and being substantially limited in "the specialized type of walking required of a train conductor" is not appropriate for decision at the summary judgment stage. (Def.'s Mot. 4.) Compare Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir.1996) (finding no "regarded as" disability where employer was merely aware of employee's limp in his walk), with Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 23 (1st Cir.2002) (holding that "a missing hand is a more profound impairment than a simple inability to lift objects ... because she only has one available limb ... notwithstanding her extraordinary efforts to compensate for her impairment"), and Todd v. City of Cincinnati, 436 F.3d 635, 638 (6th Cir. 2006) (holding that summary judgment was inappropriate where plaintiff offered evidence that the individuals making the employment decisions "believed that plain-

tiff had left the police department due to a disability that would make him unable to perform the duties of a firearms instructor"). EEOC has offered evidence that BNSF believes Payne is unable to walk safely on uneven surfaces, unable to sense where his foot is located, is prone to ulcerations on his stump over time, and is more likely to slip, trip, and fall than the average person who is not an amputee. (Gambrell Dep. 68, 72, 75–76, 162–164.) Whether these beliefs rise to the level of regarding Payne as substantially limited in walking presents a genuine issue of material fact for the jury to determine. Defendant's motion for summary judgment on Plaintiff's regarded-as disability claim is DENIED as it relates to the major life activity of walking.

### 2. Regarded as Substantially Limited in Working

█ Where "the major life activity under consideration is working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are [regarded as] unable to work in a broad class of jobs." Cotter v. Ajilon Serv., Inc., 287 F.3d 593, 599 (6th Cir.2002) (quoting Sutton, 119 S.Ct. at 2151). "One must be precluded from more than one type of job, a specialized job, or a particular job of choice ... if a host of different types of jobs are available, one is not precluded from a broad range of jobs." Sutton, 119 S.Ct. at 2151.

█ EEOC argues that "Defendant's beliefs about Payne's substantial restrictions in walking and his confinement to sedentary work could disqualify him from a broad array of jobs." (Pl.'s Resp. 5.)

4. Proprioception is the sense of the relative position of certain parts of the body. If an individual lacks proprioception in a body part, he cannot determine where that body part is positioned without looking at it. The parties dispute whether Payne's prosthetic limb allows him any proprioception in his amputated right leg and foot. (Def.'s SOF ¶¶ 15–16; Pl.'s SOF ¶¶ 15–16.)

EEOC offers no evidence, however, that BNSF attempted to confine Payne to strictly sedentary work. EEOC does not allege that Payne sought any position other than conductor and was denied that job. EEOC does not argue that the position of railroad conductor represents a "broad class of jobs." *See id.* at 2151. EEOC does not dispute BNSF's contention that it considered Payne "for jobs as engineer, dispatcher, or yardmaster," provided Payne with three weeks of corporate training and seven weeks of on-the-job training, and attempted to bring him back to work at a position other than train conductor.[5] (Def.'s Reply 8; Gambrell Decl. ¶ 13.) The evidence establishes that BNSF considered Payne to be limited with respect to one particular job: train conductor. EEOC offers no evidence to refute this conclusion. No reasonable jury could find that BNSF regarded Payne as unable to work in a "broad range of jobs" as contemplated by the Supreme Court in *Sutton.* Defendant's motion for summary judgment on Plaintiff's regarded-as disability claim is GRANTED as it relates to the major life activity of working.

### 3. Reliance on Doctors in Making Decision

 Where an employer follows the recommendations of a treating physician, the employer's belief that the plaintiff is substantially limited is not considered mistaken. *See Mahon v. Crowell,* 295 F.3d 585, 592 (6th Cir.2002). Thus, following a treating physician's recommendations about the employee's ability to work might shield an employer from liability on a "regarded-as" disability claim because the employer is not viewing the employee "through stereotypes based on [his] impairment." *Cannon v. Levi Strauss & Co.,* 29 Fed.Appx. 331, 336 (6th Cir.2002). BNSF argues that it relied on doctors' opinions when making its decision because Gambrell consulted with the BNSF medical staff before deciding not to return Payne to work as a conductor. (Def.'s Reply 2.) EEOC replies that Gambrell cannot have relied on physicians' opinions because the three doctors on whom she allegedly relied were not yet involved in Payne's case when Gambrell made the employment decision. (Pl.'s Resp. 6–7.) EEOC also argues that BNSF is not shielded from liability based on Gambrell's consultation with doctors because those doctors never personally examined Payne or performed an individualized assessment of his ability to work with his impairment. (*Id.* 6–7; Pl.'s Sur–Reply Mem. in Supp. of Its Resp. in Opp. to Def.'s Mot. for Summ. J. 5–6.) ("Pl.'s Sur–Reply")

Gambrell has stated that she considered the advice and opinions of three BNSF doctors in making her decision—Dr. Thomas J. Pace, Dr. Michael R. Jarrard, and Dr. Sharon Clark. (Gambrell Decl. ¶ 7; Gambrell Dep. 161–63.) None of these three doctors was Payne's treating physician. Not one of these doctors ever saw Payne or personally examined him. (Gambrell Dep. 89–90.) As such, the cases that BNSF cites for the principle that Gambrell's reliance on medical opinions shields BNSF from liability are distinguishable from the case at bar.

To support its position, BNSF cites two Sixth Circuit cases, *Cannon* and *Mahon.*[6] In each of those cases, the plaintiff's treat-

---

**5.** Although EEOC refers to the alternate positions as "sedentary work," it offers no evidentiary support for that characterization. (Pl.'s Resp. 5.)

**6.** BNSF cites a number of cases from other Circuit Courts of Appeals. Because those cases are not binding precedent, and because the Sixth Circuit has sufficiently addressed this issue, the Court limits its analysis to Sixth Circuit precedent.

ing physician recommended to the plaintiff's employer that the plaintiff either not be allowed to return to work or be allowed to return with substantial work restrictions in place. *Cannon*, 29 Fed.Appx. at 333; *Mahon*, 295 F.3d at 586. When the employers followed the doctors' recommendations, the Sixth Circuit held that the employers could not be liable on a regarded-as disability claim under the ADA because they were not "wrongly viewing [the plaintiffs] through a stereotype of disability." *Mahon*, 295 F.3d at 592.

 In the case at bar, however, Payne's treating physician released Payne to return to work without restrictions in January, 2004. (Payne Dep. 105–07.) Even if Gambrell relied on medical recommendations in making her decision, the doctors on whose opinions she relied were not Payne's treating physicians, but were BNSF doctors who had never seen or examined Payne. BNSF cites no Sixth Circuit precedent that allows an employer to disregard a treating physician's recommendation in favor of its own, non-treating doctor's opinion.[7] *Cf. Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 665 (6th Cir. 2008) (rejecting a regarded-as disability claim because the employer's actions "simply tracked the specific and valid restrictions prescribed *by her own doctor*") (emphasis added); *Cannon*, 29 Fed.Appx. at 336 (no regarded-as disability where the employer "followed the specific recommendations of [a] *treating physician*") (emphasis added); *Mahon*, 295 F.3d at 592

(same). Gambrell relied on the opinions of BNSF staff doctors who had never examined Payne, ignoring Payne's treating physician's recommendation. BNSF's argument that such action shields it from liability on Payne's regarded-as disability claim is unsupported by the relevant Sixth Circuit case law and is unavailing.

### B. "Record–Of" Disability

 To establish a case of a record-of disability, a plaintiff must show that he has a "history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 28 C.F.R. § 35.104. A plaintiff must provide evidence of a record of being "actually disabled" under the ADA. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir.2002). BNSF argues that Payne's doctors' notes do not represent such evidence because they show only that Payne has a physical impairment and do not establish him as disabled for purposes of the ADA. (Def.'s Mot. 7.) BNSF argues that, although there is evidence that Payne had a temporary disability, ADA disabilities must be permanent or long term. (*Id.*) EEOC replies that Payne has a record-of disability because his medical records state that he was "unable to perform any duties" and that his restrictions were "permanent." (Pl.'s Resp. 7.)

 EEOC has established that Payne has a record of an ADA disability. On

7. BNSF argues that such action shields an employer from liability under Eighth Circuit precedent. Not only is such precedent not binding on this Court, but the case that BNSF cites for this proposition is distinguishable for several reasons. *See Pittari v. Am. Eagle Airlines, Inc.*, 468 F.3d 1056 (8th Cir.2006). First, the primary basis for the court's decision was that the employer's restrictions on the plaintiff's employment were temporary. Thus, the employer did not regard the plain-

tiff as disabled under the ADA. *Id.* at 1062–63. Second, the employer relied on an alternate, independent medical opinion in reaching its decision, rather than relying solely on its own medical staff. *Id.* at 1063. Third, the doctors on whose opinions the employer relied in *Pittari* were treating doctors who had personally examined the plaintiff. *Id.* Thus, *Pittari* offers no support for BNSF's argument in this case.

April 9, 2003, BNSF received a Medical Status Form from Payne's health care provider that stated that Payne was "unable to perform any duty" and listed Payne's work restrictions as "permanent." (Payne Dep. Ex. 5.) The report listed for Payne "permanent restrictions of essentially sedentary work with no lifting greater than 10 pounds." (Clark Dep. 41; Clark Dep. Ex. 1.) An April 30, 2003 Specialist Peer Review form states that BNSF's contract doctor concurred with the diagnosis of "permanent restrictions." (Gambrell Dep. Ex. 8–9.) A permanent restriction to sedentary work could be substantially limiting in the major life activities of walking and working. EEOC has established that there is a genuine issue of material fact about whether Payne had a record of an actual disability under the ADA.

BNSF argues that "[e]ven if Payne did have a record of a disability, EEOC has no evidence that BNSF decided not to return him to work as a conductor *because of* such a record." (Def.'s Mot. 8.) EEOC replies that the evidence suggests that Gambrell based her decision not to allow Payne to return to work on Payne's record of disability and his alleged lack of proprioception, rather than on his actual medical condition. (Pl.'s Sur–Reply 11–12.)

▌ Whether Gambrell based her decision not to return Payne to the conductor position on his record of disability is a genuine issue of a material fact. Gambrell testified that, as part of the decision making process, she examined the documents provided by Payne's health care provider that listed Payne's work restrictions. (Gambrell Dep. 64) Although Gambrell examined other materials and evidence in making her decision, whether she based her ultimate decision on Payne's record of

disability or on other evidence is not suitable for determination at the summary judgment stage. *See Ross*, 237 F.3d at 706 (advising that the "question [of] the employer's motive[ ]is one rarely susceptible to resolution at the summary judgment stage"). Defendant's motion for summary judgment on Plaintiff's record-of disability claim is DENIED.

### C. Receipt of Social Security Benefits

▌ In May 2004, Payne applied for Social Security Disability Insurance ("SSDI") benefits from the Social Security Administration ("SSA").[8] (Def.'s SOF ¶ 22; Pl.'s SOF ¶ 22.) In November 2004, Payne began receiving monthly SSDI benefits. (*Id.*) The Supreme Court addressed the effect of receipt of SSDI benefits on an ADA claim in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). An apparent contradiction arises when a plaintiff brings an ADA claim, asserting that he is *not* too disabled to work, but also applies for SSDI benefits, stating that he *is* too disabled to work. The Court held in *Cleveland* that an ADA plaintiff "cannot simply ignore" the contradiction, but "must proffer a sufficient explanation." *Cleveland*, 526 U.S. at 806, 119 S.Ct. 1597. Absent a sufficient explanation, an ADA plaintiff's sworn assertion in an application for disability benefits will negate an essential element of the plaintiff's ADA claim. *Id.* "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of

---

**8.** Plaintiff submits that Payne initially applied for SSDI benefits in July 2003, and that his submission to the SSA in May 2004 was a request for reconsideration. (Pl.'s SOF ¶ 22.) The only application at issue here, however, appears to be the May 2004 submission.

[his] job, with or without 'reasonable accommodation.'" *Id.* at 807, 119 S.Ct. 1597.

EEOC offers four possible explanations for Payne's application for and receipt of SSDI benefits, each of which, it argues, sufficiently reconciles the apparent contradiction discussed in *Cleveland*: (1) that Payne's condition changed over time such that a statement made when applying for benefits did not reflect his capacities when the employment decision was made; (2) that Payne's impairment met a specific listing requirement that entitled him to receive SSDI benefits; (3) that Payne's statements of disability to the SSA were actually statements about how BNSF perceived his condition; and (4) that Payne was engaged in an SSA-approved trial-work period.

### 1. Changed Condition

■■ If a plaintiff's disabling condition changes over time, "so that a statement about that disability at the time of [the] application for SSDI benefits may not reflect [the plaintiff's] capacities at the time of the relevant employment decision," that change may offer a sufficient explanation for a *Cleveland* contradiction. *Id.* at 805, 119 S.Ct. 1597. EEOC argues that Payne became increasingly depressed after he learned that he would not be allowed to return to his conductor position and that this psychological condition prevented him from being able to work before he applied for SSDI benefits. BNSF replies that "EEOC engages in sophistry when it asserts that Payne only became disabled after BNSF declined to reinstate him" because social security records indicate that the SSA considered Payne to be disabled before Gambrell's employment decision was made. (Def.'s Reply 14.)

■■ The Disability Determination that the SSA produced in approving Payne for receipt of SSDI benefits lists his diagnosis as "Affective/Mood disorders." (Pl.'s SOF ¶ 22; Pl.'s Resp. Ex. 17, EEOC 00585.) Thus, it was a psychological condition, and not Payne's physical condition as an amputee, that qualified him for receipt of SSDI benefits. The SSA's determination letter, however, states that Payne became disabled on March 23, 2003, the day of Payne's motorcycle accident. (Payne Dep. Ex. 23.) Payne also testified that his initial application to the SSA was denied and that he was approved in May 2004 after filing a request for reconsideration. (Payne Dep. at 202–05.) It is unclear from the record what basis the SSA offered, if any, for reversing its previous decision, or if the SSA found that Payne's condition had changed between the time of his initial application and his request for reconsideration. The fact that it considered Payne disabled as of March 23, 2003, suggests that it did not find his condition had changed. Payne has testified, however, that BNSF's refusal to reinstate him to his conductor position caused his depression. (Payne Decl. ¶ 4.) "[A]ssuming the truth of, or [Payne's] good-faith belief in," this statement, it is possible that Payne could have performed the essential conductor duties in January or February 2004, the time period EEOC identified for Gambrell's adverse employment decision, but that by May 2004, he believed that he was too disabled to work. *Cleveland*, 526 U.S. at 807, 119 S.Ct. 1597. Reading the facts in the light most favorable to EEOC, a reasonable juror could determine that Payne was qualified, or had a good-faith belief that he was qualified, to perform the duties of a conductor at the alleged time of BNSF's decision in early 2004.

### 2. Listing Requirement

■■ To help process the large number of SSDI claims, the SSA maintains a Listing of Impairments. *Id.* at 804, 119 S.Ct. 1597. If an applicant's condition or dis-

ability is a specifically listed impairment, that applicant is presumed to qualify for SSDI benefits, and the SSA conducts no further, individualized inquiry. *Id.*; *see also* 20 C.F.R. §§ 404.1520(d), 404.1525. Therefore, if a person's application for SSDI benefits is approved based on a listed impairment and a presumption of disability, the application may not be contradictory to an ADA discrimination claim.

EEOC argues that, because Mood Affective Disorder is a listed condition under the Social Security Act, it entitles Payne to SSDI benefits regardless of his actual ability to do his job and is not at odds with his ADA claim. BNSF replies that the SSA's presumption of disability applies only to physical impairments and that the SSA must have evaluated the effect that Payne's mental impairment had on his ability to work through an individualized inquiry.

EEOC relies on *Kiely v. Heartland Rehab. Servs., Inc.*, 359 F.3d 386 (6th Cir. 2004) for its argument that Payne's having a listed impairment provides a sufficient explanation for the apparent *Cleveland* contradiction in this case. *Kiely*, however, is distinguishable from the case at bar for several reasons. First, *Kiely* was a suit brought under the Michigan Persons with Disabilities Civil Rights Act, and the court applied Michigan law. 359 F.3d at 387. The plaintiff in that case had not filed an ADA claim. *Id.* Second, the plaintiff in *Kiely* suffered from a physical impairment, blindness, that created a presumption that he was unable to work. *Id.* at 389–90. Payne's mental impairment in this case,

Mood Affective Disorder, does not necessarily create the same presumption. *See* 20 C.F.R. § 404.1520a(a) (stating that "when we evaluate the severity of mental impairments ... we must follow a special technique at each level in the administrative review process" which helps the SSA to "consider and evaluate functional consequences of the mental disorder(s) relevant to [the applicant's] ability to work"). Federal regulations required the SSA to evaluate how Payne's disability, a mental impairment, specifically affected his ability to work. *Id.* Third, the court in *Kiely* underscored the difference between including in an SSDI benefits application "context-related legal conclusions" rather than "purely factual statements" about the applicant's inability to work. *Kiely*, 359 F.3d at 390–91. Where the plaintiff stated that he was "disabled" and "unable to work," the court held that a reasonable juror could accept the plaintiff's explanation that he meant only "I am entitled to SSDI benefits." *Id.* at 390.

 In his application, however, Payne made a number of purely factual statements about how his disability affected his ability to work.[9] Regardless of whether Payne's condition is an SSA-listed impairment, no reasonable juror could interpret these statements to mean only that Payne was entitled to SSDI benefits and to have had no bearing on Payne's actual ability to work. Payne's factual representations to the SSA were not "context-related legal conclusions" as contemplated by the Sixth Circuit in *Kiely*. Approval of benefits based on Payne's mental impairment re-

---

9. Payne stated that he had "day and night" pain from his amputation. (Def.'s Mot. Ex. 14, EEOC 00624.) He stated that "because I am a below the knee amputee, I have become a liability with the company I work for that may endanger my life as well as others'." (Payne Decl. ¶ 5.) When asked "How do your illnesses, injuries or conditions limit your ability to work?," he answered: "My job required 4 or 5 miles of walking along the uneven surface of railroad track with only the light of a lantern with drop offs on either side. I used to have to get up on the trains. Now all of that is impossible." (Payne Decl. ¶ 6; Def.'s Mot. Ex. 14, EEOC 00641.)

quired the SSA to conduct an individualized assessment of his condition and ability to work. That Payne's disability was a listed impairment does not offer a sufficient explanation for the apparent *Cleveland* contradiction where, as in this case, the applicant makes purely factual representations about how his disability affects his work.

### 3. Inconsistent Statements

An ADA plaintiff can reconcile the apparent contradiction between application for SSDI benefits and an ADA claim by explaining why the statements provided in his application do not contradict his contention that he can perform the essential functions of his previous job. *Cleveland,* 526 U.S. at 798, 119 S.Ct. 1597. EEOC argues that the factual statements in Payne's application, when taken in context, are not statements about his inability to work, but are statements about how BNSF perceived Payne's condition and capabilities. BNSF replies that *Cleveland* does not permit an ADA plaintiff simply to disavow the representations on which his award of SSDI benefits was based.

EEOC's proffered explanation that Payne's seemingly contradictory statements were meant to be attributed to BNSF is sufficient to survive summary judgment in this case. Payne testified under oath that the statements in his application that he had "become a liability to the company" and that doing his job "is impossible now" referred to the reasons that BNSF had provided him for not allowing him to return to the conductor position. (Payne Decl. ¶¶ 5–6.) *Cleveland* provides that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous statement ... without explaining the contradiction or attempting to resolve the disparity." 526 U.S. at 806, 119 S.Ct. 1597. Unlike the plaintiffs in the cases cited by BNSF,[10] however, EEOC has explained the apparent contradiction and attempted to resolve the disparity. Payne has testified that his statements were not purely factual representations, but rather assertions of BNSF's perception of his condition. This explanation is more than a mere denial or renunciation of his previous assertions; it attempts to reconcile the disparity in the conflicting statements.

At the summary judgment stage, the evidence and the inferences to be drawn from the underlying facts must be viewed in the light most favorable to EEOC, the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Credibility determinations and the weighing of evidence are jury functions, not those of the court when ruling on a motion for summary judgment. *Anderson,* 477 U.S. at 265, 106 S.Ct. 2505. EEOC has established a genuine issue of material fact about whether Payne's statements in his SSDI application are irreconcilably inconsistent with his testimony in this case.

### 4. Trial Work Period

"[T]o facilitate a disabled person's reentry into the workforce, the SSA authorizes a 9–month trial-work period during which SSDI recipients may receive full benefits." *Cleveland,* 526 U.S. at 805, 119 S.Ct. 1597; *see also* 42 U.S.C. §§ 422(c), 423(e)(1); 20 C.F.R. § 404.1592. Therefore,

10. *See, e.g., Johnson v. ExxonMobil Corp.,* 426 F.3d 887, 892 (7th Cir.2005) (plaintiff "merely argues that he was mistaken in his SSDI application"); *Lee v. City of Salem, Ind.,* 259 F.3d 667, 676 (7th Cir.2001) (plaintiff "has not attempted to qualify his prior statements *at all*" but instead "indicates that he has since [his SSDI application] had a change of heart").

statements made to the SSA to obtain benefits may not be inconsistent with a plaintiff's ADA claim where the plaintiff is engaging in an SSA-approved trial-work period and reporting his earnings to the SSA. BNSF argues that, because Payne was not participating in a trial-work period on the date EEOC identifies as that of the adverse employment decision, this explanation does nothing to reconcile the inconsistency between EEOC's current claim and Payne's receipt of SSDI benefits. EEOC replies that Payne's non-participation in a trial-work period when the decision was made is irrelevant because Payne was not receiving SSDI benefits then.

BNSF's argument about the timing of Payne's trial-work period and his receipt of SSDI benefits is unavailing. Payne's treating physician did not release him to return to work until January 19, 2004. (Payne Dep. at 117–18.) That Payne had not begun a trial-work period by that time is irrelevant to the apparent *Cleveland* contradiction in this case because Payne had not yet made his factual representations to the SSA or received SSDI benefits from it. Payne did not reapply for SSDI benefits until May 2004. The first month of Payne's trial-work period was October 2004. (Payne Decl. Ex. 1.) Payne began receiving SSDI benefits from the SSA in November 2004, during the second month of his trial-work period. (*Id.*; Payne Dep. Ex. 23.) Even accepting as true BNSF's argument that "an ADA plaintiff's participation in a trial-work period may explain his receipt of SSDI benefits at most during the months he is actually participating in the trial work program," Payne was already participating in a trial-work program when he began to receive SSDI benefits. EEOC's explanation that Payne engaged in an SSA-approved trial-work program is a sufficient reconciliation of the *Cleveland* contradiction in this case to survive summary judgment.

**D. Direct Threat Defense**

■ An employer can successfully defend against an ADA discrimination claim by establishing that the plaintiff employee did not meet the relevant qualification standards for his position. 42 U.S.C. § 12113(a); *see also Chevron U.S.A., Inc. v. Echazabal,* 536 U.S. 73, 77–79, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002). "[Q]ualification standards may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). Federal regulations provide guidelines for determining whether an employee poses a direct threat:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.

29 C.F.R. § 1630.2. An employer's adverse employment decision against an employee based on a direct safety threat posed by the employee must be objectively reasonable in light of the available medical evidence. *Bragdon v. Abbott,* 524 U.S. 624,

649–50, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). A subjective belief that a direct threat exists, even if maintained in good faith, will not shield an employer from liability unless it is objectively reasonable. *Id.*

BNSF argues that the summary judgment record establishes as a matter of law that Payne would present a direct threat to the safety of himself or others if he were allowed to return to the conductor position. EEOC replies that BNSF could not have reasonably concluded that Payne would present a direct threat as a conductor because it failed to perform the fact-based, individualized inquiry about his condition required by federal regulations.

 Whether BNSF's decision that Payne posed a direct safety threat was objectively reasonable presents a genuine issue of material fact for the jury to determine. BNSF has presented evidence that Gambrell consulted with numerous doctors before deciding that Payne could not perform the conductor duties safely. (Gambrell Decl. ¶ 7; Gambrell Dep. 161–63.) BNSF concedes, however, that none of the doctors on whose opinion Gambrell relied ever physically examined or observed Payne. (Def.'s Mot. 13.) BNSF argues that "because Payne's lack of proprioception is an undeniable medical fact, physical observation was pointless." (*Id.*)

EEOC has presented medical evidence that conflicts with BNSF's. It is undisputed that Payne's treating physician determined that Payne could perform his conductor duties safely and released him to return to work. A reasonable juror could find that BNSF's conclusion that Payne posed a direct threat was not the type of "individualized assessment" required by federal regulations. Without observing Payne or his personal condition, BNSF concluded that he was unable to work as a conductor. The Interpretive Guidance section of the ADA provides that relevant evidence in determining whether a direct threat exists "may include input from the individual with the disability, the experience of the individual with a disability in similar positions, and opinions of medical doctors, rehabilitation counselors, or physical therapists who have expertise in the disability involved and/or direct knowledge of the individual with the disability." 29 C.F.R. Pt. 1630, App.

Although BNSF consulted medical specialists with knowledge of below-the-knee amputations, it admittedly found no need to examine Payne directly or consult those who had. BNSF's decision that Payne posed a direct threat was based on his status as a below-the-knee amputee. In light of the conflicting medical testimony and the relevant federal guidelines and regulations, the Court cannot conclude as a matter of law that BNSF's decision that Payne posed a direct threat was objectively reasonable such that it should shield BNSF from liability on an ADA claim. This question is not suitable for determination at the summary judgment stage.

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendant's motion for summary judgment on Plaintiff's regarded-as disability claim is GRANTED as it relates to the major life activity of working and DENIED as it relates to the major life activity of walking. Defendant's motion for summary judgment on Plaintiff's record-of disability claim is DENIED.