*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| L STREET INVESTMENTS, | ) | |
| | ) | Supreme Court No. S-14466 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-12355 CI |
| v. | ) | |
| | ) | O P I N I O N |
| MUNICIPALITY OF ANCHORAGE, | ) | |
| and ANCHORAGE DOWNTOWN | ) | No. 6816 – August 23, 2013 |
| PARTNERSHIP, Ltd., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, John Suddock, Judge.

Appearances:  Christopher J. Slottee, Atkinson, Conway & Gagnon, Inc., Anchorage, for Appellant.  Sean Halloran, Littler Mendelson, P.C., Anchorage, for Appellee Anchorage Downtown Partnership, Ltd.  Deitra Ennis, Assistant Municipal Attorney, and Dennis Wheeler, Municipal Attorney, Anchorage, for Appellee Municipality of Anchorage.

Before:  Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

The former Anchorage Municipal Code provided for the creation of special assessment districts for public capital improvements. On June 11, 1996, the Anchorage Municipal Assembly (Assembly) enacted Anchorage Ordinance 96-77(S-I) to broaden "special assessment districts" to include the provision of services and to authorize business improvement districts. In 1997 the Assembly passed Anchorage Ordinance 97-51, which created the Downtown Improvement District (District) for a period of three years. When passing this ordinance, the Assembly amended the boundaries of the proposed District to exclude some properties on K and L Streets. The building at 420 L Street, the property owned by appellant L Street Investments, was in the original proposal but subsequently carved out by the Assembly. In 2000 the Assembly extended the life of the District for ten years. Beginning in 2009, the Anchorage Downtown Partnership canvassed businesses hoping to extend the life of the District again and expand the District to include businesses between I and L Street. After the majority of business owners in the proposed District approved the extension and expansion, the Assembly extended the life of the District and expanded it to include businesses between I and L Streets, including the building at 420 L Street.

L Street Investments filed a complaint arguing: (1) Section 9.02(a) of the Municipality of Anchorage's Charter does not authorize the Municipality to finance services within the District by an assessment — rather, the Municipality can finance services only by a tax levy; and (2) the District is a "service area," and AS 29.35.450(c) prohibits the expansion of a service area unless a majority of voters in the area to be added vote in favor of expanding the service area. The Anchorage Downtown Partnership intervened, and all parties filed cross-motions for summary judgment. The superior court granted summary judgment to the Municipality and the Anchorage Downtown Partnership. We affirm.

## II.   FACTS AND PROCEEDINGS

In late 1994 and early 1995, a group of Anchorage business and civic leaders formed the Downtown Action Committee to develop a vision to revitalize downtown Anchorage.  In April 1995 the Committee decided to develop  a "business improvement district" to provide services that enhanced the beauty, safety, convenience, and vibrancy of downtown Anchorage.  In January 1996 the Committee incorporated under the name Anchorage Downtown Partnership, Ltd. (Partnership).

At the time, Title 19 of the Anchorage Municipal Code provided for the creation of special assessment districts for capital improvements; it did not provide for the creation of districts for public services such as a business improvement district.  On June 11, 1996, at the urging of the Partnership, the Assembly enacted Anchorage Ordinance 96-77(S-I) to broaden "special assessment districts" to include the provision of public services, thereby authorizing business improvement districts.[1]  The Anchorage Municipal Code now states:

> A special assessment district, including a business improvement district, may be initiated for public capital improvements or for public services as specifically defined by the ordinance creating the assessment district, as provided in this section.[2]

---

[1]      Anchorage Code Ordinance (ACO) 96-77(S-I) (1996).

[2]      Anchorage Municipal Code (AMC) 19.10.020(A) (1996).  Subsection (A)(2)  provides:

> Assessment districts for public services may be initiated only for public services specified in this subsection . . . .
>
> a.      Maintenance, repair and upkeep of any public capital improvement created by an assessment district;

(continued...)

-3-                                                        6816

A special assessment district can enhance but not replace city services already provided:

> Assessment districts for services shall provide an enhanced or supplemental public service or new public service not provided by the municipality generally. The establishment of an assessment district for services shall not operate unilaterally or by implication as a substitute for or to reduce

---

[2](...continued)

    b.    Maintenance, including snow removal/disposal and dust suppression, cleaning and beautification and decoration of public places, areas, facilities and rights-of-way such as:

        (1)    Streets, roads, alleys, parkways, street lighting, curbs and gutters, driveways, curb cuts and parking areas and facilities;

        (2)    Sidewalks, trails and other pedestrian ways and facilities;

        (3)    Parks and recreational areas and facilities;

    c.    Visitor and tourism public services;

    d.    Security services not including law enforcement services;

    e.    Promotion of public events within the assessment district and promotion of the assessment district itself as an area of enhanced public services.

    f.    Other public services closely similar to those listed in subsections A.2.a. through A.2.e. of this subsection designed to promote the vitality, stability and improvement of the assessment district as a whole.

or eliminate the nature or extent of services provided by other means.[3]

A special assessment district can be initiated either by a petition of property owners in that district or by the Assembly, but it "may be created or extended only with the approval of the property owners who would bear more than 50 percent of the estimated cost of the improvement or service."[4] The Assembly then holds a public hearing "upon the necessity for the proposed improvement or service."[5] After the public hearing, the Assembly decides whether to proceed with the proposal:

> [T]he assembly shall adopt an ordinance determining either to proceed or not to proceed with the proposed improvement or service. The ordinance to proceed shall find that the improvement or service is necessary, of benefit to the properties to be assessed, and that the petition for the improvement or service has been approved by sufficient and proper petitioners. The findings of the assembly are conclusive.[6]

In 1997 the Assembly passed Anchorage Ordinance 97-51, which created Assessment District 1SD97 for a period of three years.[7] When passing AO 97-51, the Assembly amended the boundaries of the proposed Assessment District to exclude some properties on K and L Streets. The building at 420 L Street, the property owned by L Street Investments (L Street), was included in the original proposal but subsequently carved out by the Assembly.

---

[3]     AMC 19.10.020(B).

[4]     AMC 19.20.010(B).

[5]     AMC 19.20.040.

[6]     AMC 19.20.050.

[7]     ACO 97-51 (1997).

The boundaries of the District were Gambell Street to the east, Ninth Avenue to the south, and First Avenue to the north; the western boundary ran from Ninth Avenue to Sixth Avenue on K Street and from Sixth Avenue to Second Avenue on I Street. The enumerated powers of the District were:

A. Maintenance, repair and upkeep of public capital improvements located in the area of the assessment district;

B. Maintenance, snow removal, dust suppression, cleaning, beautification, and decoration of public parks, places and pedestrian rights-of-way;

C. Visitor and tourism services;

D. Security services, but not including law enforcement services;

E. Promotion of the assessment district and the promotion of public events within the assessment district; and

F. Other closely similar public services promoting the vitality, stability and improvement of the assessment district.[8]

The District collected assessments for its services based on the value of each property within its boundaries:

Each assessable parcel within . . . Assessment District 1SD97 shall be assessed at a mill rate not to exceed 1.5 mills of assessed value ($1.50 per $1,000 of assessed value) up to and

---

[8] ACO 97-51 § 4 (1997); *see also* ACO 2010-58(S) § 5 (2010) (extending the life of the District for an additional ten years); ACO 2000-98 § 4 (2000) (extending the life of the District for ten years).

including $10,000,000 plus $100 per $1,000,000 of assessed value in excess of $10,000,000.[9]

Government-owned properties, churches, and non-profit religious, charitable, or educational organizations were exempt from the assessments.[10] Further, qualified owners of single-family, owner-occupied residences who timely applied for an exemption were also exempt from assessment.[11]

In 2000 the Assembly extended the life of the District for ten years.[12] Starting in 2009, the Partnership canvassed property owners about extending the life of the District again, as well as expanding the District to include businesses between I and L Streets. The Partnership circulated petitions to property owners within the original District for the owners to indicate whether they were in favor of continuing the District and expanding it or whether they wished to terminate the District. The Partnership also circulated petitions to property owners in the proposed expansion area for those owners to indicate whether they were in favor of or opposed to extending the District. Responses showed that owners of 316 properties — representing 62% of the total assessment value of the District including the proposed expansion area — supported reenactment and expansion. Owners representing 12% of the total annual assessment stated they opposed the continuation of the district. The remaining property owners, representing approximately 26% of the total annual assessment, did not return the petitions. Out of the 63 properties in the proposed expansion area that returned petitions, 33 opposed being added to the District; those in opposition comprised a total annual

---

[9]    ACO 97-51 § 5; *see also* ACO 2010-58(S) § 6; ACO 2000-98 § 5.

[10]    ACO 97-51 § 7; *see also* ACO 2010-58(S) § 8; ACO 2000-98 § 6.

[11]    ACO 97-51 § 7; *see also* ACO 2010-58(S) § 8; ACO 2000-98 § 6.

[12]    ACO 2000-98.

assessment of $67,615, or 43.2%.[13] Thirty properties in the expansion area with a total annual assessment of $89,057, or 56.8%, were in favor of the expansion.

On September 28, 2010, the Assembly passed AO No. 2010-58(S) (Ordinance), which extended the life of the District and expanded it to include I Street and L Street north of Ninth Avenue.[14] This included L Street Investment's building, 420 L Street, which had an estimated assessment of $10,962 annually.

L Street filed a complaint for declaratory judgment in the superior court against the Municipality on November 24, 2010. L Street argued: (1) Section 9.02(a) of the Municipality of Anchorage's Charter does not authorize the Municipality to finance services within the District by an assessment — rather, it can finance services only by a tax levy; and (2) the District is a "service area," and AS 29.35.450 prohibits the expansion of a service area unless a majority of voters in the area to be added vote in favor of expanding the service area. The Partnership intervened. All parties filed cross-motions for summary judgment, and oral argument was held before Superior Court Judge John Suddock on January 18, 2011. The superior court granted summary judgment to the Municipality and the Partnership and denied L Street's motion. The court concluded that AS 29.35.450, which governs service areas such as parks and recreation service areas, does not govern the District because the District "has a different scope and administrative structure." The court also concluded "that [S]ection 9.02 of the

---

[13]     It is not clear from the record if some of the property owners in the expansion area did not return their petitions. Further, the calculation of 43.2% was determined by summing the assessment value of those owners opposed ($67,615) and dividing by the total assessment value of the expansion area ($156,672). This total assessment value and the petition totals are different from the figures the appellant provided in its brief because the appellant overlooked two petitions opposed to expansion from Platinum Jaxx and an office building on Sixth Avenue.

[14]     ACO 2010-58(S).

Charter does not prohibit assessments for services within the District." The court entered final judgment in favor of the Municipality and the Partnership.

L Street appeals.

## III. DISCUSSION

### A. Standard Of Review

A grant of summary judgment is reviewed de novo, "drawing all permissible factual inferences in favor of, and viewing the facts in the light most favorable to, the non-prevailing party."[15] "We affirm grants of summary judgment if there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law."[16] We apply our independent judgment when interpreting statutes, municipal charters, and municipal codes.[17]

### B. The Municipality of Anchorage Has The Authority To Fund Special Services By Assessment.

The Municipality is a unified home rule municipality.[18] Under article X, section 11 of the Alaska Constitution, "A home rule borough or city may exercise all

---

[15] *Bradshaw v. State, Dep't of Admin., Div. of Motor Vehicles*, 224 P.3d 118, 121-22 (Alaska 2010).

[16] *Id.* at 122.

[17] *Municipality of Anchorage v. Repasky*, 34 P.3d 302, 305 (Alaska 2001).

[18] AS 29.06.190(a) ("A borough and all cities in the borough may unite to form a single unit of home rule government . . . ."); AS 29.06.410 ("A municipality unified under AS 29.06.190-29.06.410 has all powers (1) not prohibited by law or charter; and (2) granted to a home rule borough."); AS 29.71.800(24) (defining "unified municipality" as "a municipality unified in accordance with AS 29.06.190-29.06.410"); Anchorage Municipal Charter §§ 1.01, 1.02 (naming municipality and defining its boundaries); Anchorage Municipal Charter § 3.01 ("The municipality may exercise all legislative powers not prohibited by law or by this Charter.").

legislative powers not prohibited by law or charter."[19] Section 3.01 of the Municipality's Charter similarly states, "The municipality may exercise all legislative powers not prohibited by law or by this Charter." The Commentary to this section reads:

> By virtue of this section the new government will be a home rule municipality. This section brings all allowable legislative power from the state level to the local level. However, Sections 9.01 and 9.02, and other provisions of the Charter calling for voter approval of government action, reserve to the people the basic power to determine if and when the municipal power will be exercised.[20]

Although the legislative powers of the Municipality may be limited by state law or the Municipal Charter, the legislative powers are not dependent on "specific grants of power from a state legislature."[21] Instead, the Municipality derives its legislative power from article X, section 11 of the Alaska Constitution. Thus, based on the plain language of the Alaska Constitution and the Anchorage Municipal Charter, the District has the authority

---

[19]     Alaska Const. art. X, § 11.

[20]     Commission Commentary on Anchorage Municipal Charter: An aid to legislative history, to assist in the interpretation of the Charter document, § 3.01 (Aug. 20, 1975).

[21]     *Jefferson v. State*, 527 P.2d 37, 42 (Alaska 1974); *see also Liberati v. Bristol Bay Borough*, 584 P.2d 1115, 1120 n.19 (Alaska 1978) ("Dillon's rule . . . states: [a] municipal corporation possesses and can exercise the following powers and not others. First, those granted in express words; second, those necessarily implied or necessarily incident to the powers expressly granted; third, those absolutely essential to the declared objects and purposes of the corporation not simply convenient, but indispensable. The minutes of the constitutional convention reveal that the liberal construction clause of Article X, Section 1 was intended to assure that general law municipalities, as well as those having home rule powers, would not be governed by [Dillon's] rule, but would have their powers liberally interpreted.").

to impose an assessment on property owners within the District so long this action is not limited by state law or the Charter.

L Street argues that because the Ordinance imposes an assessment for services, the Ordinance is invalid because it finances those services in a manner contrary to Section 9.02(a) of the Municipality's Charter. Section 9.02(a) of the Charter states:

> The Assembly by ordinance may establish assessment districts to provide and finance capital improvements by means of an assessment, or services by means of a tax levy. The assessment or levy shall be proportionate to the benefit received from and the burden imposed upon the improvement or service. The Assembly by ordinance shall prescribe uniform criteria for allocating the cost of the improvement or service within an assessment district.

L Street argues that the Charter does not allow the Municipality to impose an assessment to finance services in the District. Instead, L Street contends the Charter specifically provides that the Municipality can only use an assessment to finance capital improvements and can only use a tax levy to finance services. Thus, L Street considers Charter Section 9.02 to be a limit on the Municipality's home rule power. We disagree.

We conclude that Section 9.02(a) does not preclude the Municipality from levying an assessment for services because the language in Section 9.02(a) is permissive rather than mandatory, and does not expressly prohibit the Municipality from using an assessment to finance services. The Municipality, as a unified home rule municipality, enjoys broad authority to exercise all legislative powers not prohibited by law or Charter.[22] The use of assessments to finance services is not prohibited by law or Charter and is therefore a valid exercise of the Municipality's authority.

---

[22] Alaska Const. art. X, § 11.

**1. The plain language of the Anchorage Municipal Charter does not forbid the funding of special services by assessment.**

In interpreting municipal charters, "we are guided by the rules of statutory construction."[23] L Street argues, "The Charter must, if possible, be construed to give effect to every word and phrase, and a construction that renders any portion of the Charter superfluous should be rejected."[24] However, the Commentary to the Charter specifically states, "As used in this Charter, 'may' is permissive, 'shall' is mandatory, and 'may not' or 'shall not' are prohibitive."[25] The first sentence of Section 9.02(a) states, "The assembly by ordinance *may* establish districts to provide and finance capital improvements by means of an assessment, or services by means of a tax levy." (Emphasis added.) L Street interprets Section 9.02(a) as providing the Municipality with the discretion to create and finance districts. Should the Municipality choose to create a district, L Street interprets Section 9.02(a) as mandating the manner in which the district is financed — an assessment for capital improvements or a tax levy for services.

The Partnership and the Municipality, in contrast, argue that "[n]othing in this provision precludes the Municipality from creating a special assessment district to furnish services." They note that the last sentence of Section 9.02 provides for the creation of assessment districts for services by stating, "The [A]ssembly by ordinance shall prescribe uniform criteria for allocating the cost of the improvement *or service*

---

[23] *City & Borough of Sitka v. Int'l Bhd. of Elec. Workers, Local Union 1547,* 653 P.2d 332, 335-36 (Alaska 1982) (internal citation omitted).

[24] *See Mech. Contractors of Alaska, Inc. v. State, Dep't of Pub. Safety*, 91 P.3d 240, 248 (Alaska 2004).

[25] Commission Commentary on Anchorage Municipal Charter: An aid to legislative history, to assist in the interpretation of the Charter document, § 17.11 (Aug. 20, 1975).

*within an assessment district.*" (Emphasis added.)  Further, they argue that "the permissive 'may' cannot lawfully be construed as a prohibition on any other manner of funding services" because "[w]here no Charter provision and no statute provides that the Municipality 'may not' or 'shall not' fund services with an assessment, there is no prohibition on doing so."

This argument is compelling.  Under both article X, section 11 of the Alaska Constitution and Section 3.01 of the Municipality's Charter, the Municipality "may exercise all legislative powers not prohibited by law or charter."  Section 9.02 of the Charter contains no prohibitory language, and the Commentary to the Charter provides instruction on how to interpret the Charter, undermining L Street's interpretation.  L Street's interpretation of the permissive "may" would create a prohibition where none exists.

L Street also contends that the basic principles of statutory construction, particularly the maxim *expressio unius est exclusio alterius*,[26] "requires the Municipality to finance services in the District by use of a tax levy, instead of an assessment," and that the Municipality's interpretation "renders § 9.02(a) a nullity."  L Street argues that the specification in Section 9.02 of a tax levy to finance services "supports the conclusion that all other means of financing, including by assessment, are not allowed."

The superior court concluded that applying the maxim *expressio unius est exclusio alterius* was "inappropriate" because "there is no categorical listing of items

---

[26]     This maxim is a canon of statutory construction meaning "where certain things are designated in a statute, 'all omissions should be understood as exclusions.' " *Puller v. Municipality of Anchorage*, 574 P.2d 1285, 1287 (Alaska 1978) (quoting 2A C. SANDS, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47.23, at 123 (4th ed. 1973)).

attended by a telling omission" in Section 9.02(a). We agree. The United States Supreme Court has stated:

> As we have held repeatedly, the canon *expressio unius est exclusio alterius* does not apply to every statutory listing or grouping; it has force only when the items expressed are members of an "associated group or series," justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence.[27]

In a different case the Supreme Court explained, "The canon depends on identifying a series of two or more terms or things that should be understood to go hand in hand, which is abridged in circumstances supporting a sensible inference that the term left out must have been meant to be excluded."[28]

Here, as the superior court concluded, financing capital improvements by means of an assessment and financing services by means of a tax levy are not "members of an associated group or series" that "justify[] the inference that items not mentioned were excluded by deliberate choice."[29] This is particularly apparent when considering that the Commentary to the Charter instructs that the word "may," which is used in Section 9.02 to describe how the Municipality can finance capital improvements and services, is "permissive."[30] Applying *expressio unius est exclusio alterius* is inappropriate because the use of the word "may" in Section 9.02 undermines the

---

   **27**    *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).

   **28**    *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).

   **29**    *Barnhart*, 537 U.S. at 168 (internal quotation marks omitted).

   **30**    *See* Commission Commentary on Anchorage Municipal Charter: An aid to legislative history, to assist in the interpretation of the Charter document, § 17.11 (Aug 20, 1975).

"sensible inference that the term left out must have been meant to be excluded."[31]  This canon of statutory construction does not support L Street's argument that Section 9.02(a) of the Charter forbids the funding of special services by assessment.[32]

---

[31]    *Chevron U.S.A. Inc.*, 536 U.S. at 81.

[32]    We address one final argument related to the plain language of the Anchorage Municipal Charter and the ordinances at issue here.  During oral argument, a discussion arose regarding the significance of the preambles to the ordinances.  Anchorage Ordinance 96-77(S-1) states in its preamble that the Assembly was "authorized in Charter Section 9.02" to amend Title 19 of the Municipal Code to provide for assessment districts for services.  In subsequent ordinances creating and extending the life of the Downtown Improvement District, the preambles contain the statement: "WHEREAS, in accordance with Anchorage Municipal Charter Section 9.02, the Anchorage Assembly provided for the creation of assessment districts for public services . . . ." *See* ACO 97-51 (1997); ACO 2000-98 (1998); ACO 2010-58(s) (2010).  To the extent one can argue that the Assembly's references to Section 9.02 in the preambles somehow indicate that the Municipality is no longer operating under its home rule power but instead cabining its power to be within the confines of Section 9.02, which L Street argues is a narrower power which would not allow creating assessment districts for public services, we provide two responses.

First, these preamble statements do not preclude the Assembly from creating assessment districts for services because "[t]he preamble of a legislative act is not part of the law, and it cannot be used to discern the legislature's intent if no doubt exists as to a statute's meaning."  1A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20:3, 123-25 (7th ed. 2011); *see also Commercial Fisheries Entry Comm'n v. Apokedak*, 680 P.2d 486, 488 n.3 (Alaska 1984) (stating that a preamble "can neither restrain nor extend the meaning of an unambiguous statute; nor can it be used to create doubt or uncertainty which does not otherwise exist" (quoting 2A C. SANDS & SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 47.04 (4th ed. 1973))).  The ordinances are abundantly clear that they create assessment districts for services and there is no need to examine the preamble to determine the Assembly's intent.

Second, even if we were to afford the preambles legal weight, the language in Section 9.02(a) does not narrow the power of the Municipality to disallow it from

(continued...)

## 2. The legislative history of the Municipal Charter does not forbid the funding of special services by assessment.

"Although the starting point in construing a statute is the language of the statute itself, reference to legislative history may provide insight that is helpful in determining the statute's meaning."[33] L Street argues that the Anchorage Area Charter Commission changed Section 3.01 to add the phrase "or by this Charter" in order "to specifically reject the claims that the Municipality 'would have no limitation upon its powers except those imposed by State law.' "[34] L Street contends that this legislative history is "dispositive" and establishes that Section 3.01 "mandates that [Section] 9.02(a) be given legal effect and meaning, and not written out of the Charter."

This argument is unpersuasive. In June 1975, after reviewing the first draft of the Charter, the Charter Production Committee recommended that the Anchorage Area Charter Commission add the phrase "or by this charter" to Section 3.01, "Powers of the Municipality."[35] The Charter Production Committee recognized that adding this phrase

---

[32](...continued) creating assessment districts for public services. As discussed in Part III.B.1 of this opinion, the use of the word "may" in Section 9.02, when interpreted under the guidelines of the Commentary to the Charter, is permissive and cannot prohibit the Municipality from creating assessment districts for public services. *See* Commission Commentary on Anchorage Municipal Charter: An aid to legislative history, to assist in the interpretation of the Charter document, § 17.11 (Aug. 20, 1975).

[33] *City & Borough of Sitka v. Int'l Bhd. of Elec. Workers, Local Union 1547*, 653 P.2d 332, 336 (Alaska 1982) (citing *N. Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 540 (Alaska 1978)).

[34] Charter Prod. Comm., Committee Report #3 to the Anchorage Area Charter Commission (June 25, 1975).

[35] *Id.* In the report, the section number was "2.01," but the substance of the section is identical to what eventually became Section 3.01 of the Charter. *See* (continued...)

was "simply redundant" because the Charter defined the word "law" as including the Charter,[36] but the Committee made this recommendation to assuage voters who had feared "an omnipotent municipal government."[37] The Charter Commission followed the recommendation of the Committee and added this phrase to the Section even though there would be no additional legal effect. Contrary to L Street's assertions, the phrase "or by this Charter" does not provide additional limitations on the powers of the Municipality such that Section 9.02 must be interpreted to require the Municipality to finance the District by tax levy only. As we have explained, the Municipality has the broad authority to exercise all legislative powers not prohibited by law or by charter.[38] The legislative history of Section 3.01 does not indicate that the use of assessments to finance services was intended to be prohibited by law or by the Anchorage Municipal Charter.

---

[35](...continued)
Anchorage Municipal Charter art. III, § 3.01.

[36]    Section 17.3(f) of the Anchorage Municipal Charter provides:

"Law" means this Charter, the ordinances and resolutions preserved by this Charter, or enacted pursuant to it, and those portions of the statutes of the State of Alaska and the Constitutions of the State of Alaska and of the United States which are valid limitations on the exercise of legislative power by home rule governments.

[37]    Charter Prod. Comm., Committee Report #3 to the Anchorage Area Charter Commission (June 25, 1975).

[38]    Alaska Const. art. X, § 11.

C.     **State Law Does Not Govern The Expansion Of The Downtown Improvement District.**

L Street argues that the District is a "service area" under state law; therefore, before the Assembly could expand the District, AS 29.35.450 required that a dual majority of the voters residing in the area to be annexed and voters residing in the existing District vote in favor of the expansion.[39]  But AS 29.35.450 applies to "service area[s] that provide[] road, fire protection, or parks and recreation services."[40]  The Municipality and the Partnership assert that the District is "purely a creature of Anchorage Municipal law" governed by Chapter 19.20 of the Municipal Code.[41]  We agree with the Municipality and the Partnership.

1.     **The Downtown Improvement District is purely a creature of municipal law.**

Anchorage Municipal Code 19.10.020 states that a special assessment district "is and shall remain a *municipal mechanism* for delivering special municipal

---

[39]     AS 29.35.450(c) provides: "A service area that provides road, fire protection, or parks and recreation services in which voters reside may not be altered . . . unless that proposal is approved, separately, by a majority of the voters who vote on the question and who reside in each of the service areas or in the area outside of service areas that is affected by the proposal."

[40]     *Id.*

[41]     In its order, the superior court determined that the District was "impliedly authorized" by AS 29.46.010(a).  This statute states, "A municipality may assess against the property of a state or federal governmental unit and private real property to be benefited by an improvement all or a portion of the cost of acquiring, installing, or constructing capital improvements."  We disagree with the superior court's reasoning.  Alaska Statute 29.46.010(a) does not apply because the District is purely a creature of Anchorage municipal law.  We affirm the superior court's decision based on this conclusion. *See Snyder v. Am. Legion Spenard Post No. 28*, 119 P.3d 996, 1001 (Alaska 2005) ("We may affirm a judgment on any grounds that the record supports, even if not relied on by the superior court.").

government services."[42]  The Downtown Improvement District is a special assessment district governed by the Anchorage Municipal Code, not AS 29.35.450.

As we previously explained, the authority to create the District arose from Anchorage Ordinance 96-77(S-I), which the Assembly enacted to broaden "special assessment districts" under Title 19 of the Municipal Code to include the provision of services.[43]  The Assembly subsequently passed Anchorage Ordinance 97-51 which created Assessment District 1SD97, the Downtown Improvement District, for a period of three years.[44]  In 2000 the Assembly extended the life of the District for ten years.[45]  Then on September 28, 2010, the Assembly passed AO No. 2010-58(S) to extend the life of the District again and expand its boundaries.[46]  This expansion, based solely on ordinances the Assembly passed, is what is at issue now.  As a unified home rule municipality, the Municipality has the authority to exercise all legislative powers not prohibited by law or charter,[47] including expanding the boundaries of a special assessment district.

> **2.  AS 29.35.450 is inapplicable.**
>
> > **a.  AS 29.35.450 does not indicate that the District is within the statute's scope.**

Alaska Statute 29.35.450(c) states in part:

---

[42]  AMC 19.10.020(C) (emphasis added).

[43]  ACO 96-77(S-I) (1996).

[44]  ACO 97-51 (1997).

[45]  ACO 2000-98 (2000).

[46]  ACO 2010-58(S) (2010).

[47]  Alaska Const. art. X, § 11.

A service area that provides road, fire protection, or parks and recreation services in which voters reside may not be altered or combined with another service area unless that proposal is approved, separately, by a majority of the voters who vote on the question and who reside in each of the service areas or in the area outside of service areas that is affected by the proposal.

The District does not provide road or fire protection services, though L Street contends that the District does provide "parks and recreation services" because it has the authority to beautify and decorate the public parks, places, and pedestrian rights-of-way.[48] L Street also argues that because the Anchorage Parks and Recreation Service Area is "responsible for beautifying, operating and maintaining Park and Recreation assets"[49] and the District has a similar responsibility, the District is providing "parks and recreation services" under the statute.

Under the plain language of AS 29.35.450, the statute applies to "service areas" that provide "road, fire protection, or parks and recreation services." While the statute clearly applies to a service area such as the Anchorage Parks and Recreation Service Area, which has the sole purpose of providing parks and recreation services, it does not expressly apply to *all* service areas that provide *any* parks and recreation services, however minimal. The statute also does not apply to a business improvement district that provides a wide variety of services, only one category of which happens to include "[m]aintenance, snow removal, dust suppression, cleaning, beautification, and decoration of public parks, places and pedestrian rights-of-way." And the legislative

---

[48]    ACO 2010-58(S) § 5 (2010).

[49]    *See* AMC 27.30.080 (1996) (establishing the Anchorage Parks and Recreation Service Area).

history of AS 29.35.450 clarifies that the legislature intended to address only certain types of service areas.

> **b.** **The legislative history of AS 29.35.450 does not suggest that the District is included in the statute's scope.**

L Street argues that the legislative history "establishes that the primary purpose of AS 29.35.450(c) was to take the power to expand service areas from local governments such as the Municipality, and vest final authority over such expansion in the voters to be added to the service area." The Partnership and the Municipality respond that the "legislative history is clear in showing that the legislation was meant to address only certain types of service areas and nothing more." The superior court agreed, concluding:

> The court finds nothing in the legislative history of [AS 29.35.450(c)] to suggest anything beyond the obvious: that the legislature wished to preclude the expansion of three well-defined types of traditional service areas over voter objection. Nothing suggests such fervency about dual-majority elections that the legislature wished to impose them in instances where a non-road, non-fire-protection, non-park service area or special assessment district might provide *de minimis* road, fire, or beautification functions.

We agree with the superior court.

In *Area G Home & Landowners Organization, Inc. (HALO) v. Anchorage*, we addressed the Anchorage Assembly's expansion of the Anchorage Police Service Area to include the growing Hillside neighborhood without a separate vote by the annexed Hillside residents.[50] The appellants in that case argued, similar to L Street here,

---

[50]     927 P.2d 728, 730-31 (Alaska 1996).

that the term "area affected" in Section 9.01 of the Anchorage Municipal Charter[51] meant the geographical area to be added to or removed from a service area.[52] We affirmed the authority of the Anchorage Assembly to expand the service area to include the Hillside without a separate vote by Hillside residents.[53]

Following this decision, in 2001 Hillside's state representative Con Bunde sponsored a bill to amend AS 29.35.450 to provide "for voter approval of the formation, alteration, or abolishment of certain service areas."[54] Throughout the committee hearings on this bill, Representative Bunde made it clear that this bill would mainly address road services areas and one fire service area.[55] Representative Bunde stated, "This legislation does not address police service. The police service issue was settled by the Alaska Supreme Court."[56] Much of the discussion and concern in the committees was over the

---

[51] Anchorage Municipal Charter § 9.01(a) provides:

A service area may be created, altered, or abolished only with the approval of a majority of those voting on the question within the area affected, or, if no qualified voter resides within the area, with the written consent of the owners of all real property within the area affected. However, the Assembly, by ordinance may consolidate service areas in which services are provided by the municipality at the same level in each of the areas to be consolidated.

[52] *HALO*, 927 P.2d at 734.

[53] *Id*. at 739.

[54] Rep. Con Bunde, Sponsor Statement for SCSCSSSHB 13, 22nd Leg., 1st Sess.

[55] Minutes, H. Community & Reg'l Affairs Comm. Hearing on SSHB. 13, 22nd Leg., 1st Sess. (Jan. 25, 2001) (comments of Representative Bunde).

[56] *Id*.; *see also* Minutes, H. Judiciary Comm. Hearing on SSHB 13, 22nd Leg., (continued...)

constitutionality of the bill. In all five of the committee meetings in the House and Senate, Representative Bunde tailored his comments to focus on "road service areas," and the discussions stemmed from that understanding.[57] Ultimately the legislature listed "road, fire protection, or parks and recreation services" in AS 29.35.450(c), although earlier versions of the bill only listed "road or fire protection services."[58]

As the superior court stated, the legislative history of AS 29.35.450 shows that the legislature was focused on specific types of service areas. It does not suggest that the legislature either contemplated or intended to impose the voting requirements of AS 29.35.450(c) on a business improvement district that does not primarily provide road, fire, or park and recreation services, but may provide some services in those areas. Neither the plain language nor the legislative history of AS 29.35.450 indicates that the

---

[56](...continued)
1st Sess. (Feb. 5, 2001) (comments of Representative Bunde).

[57]     Minutes, H. Community & Reg'l Affairs Comm. Hearing on SSHB 13, 22nd Leg., 1st Sess. (Jan. 25, 2001) (comments of Representative Bunde); Minutes, H. Community & Reg'l Affairs Comm. Hearing on H.B. 13, 22nd Leg., 1st Sess. (Jan. 30, 2001) (comments of Representative Bunde); Minutes, H. Judiciary Comm. Hearing on SSHB 13, 22nd Leg., 1st Sess. (Feb. 5, 2001) (comments of Representative Bunde); Minutes, H. Judiciary Standing Comm. Hearing on H.B. 13, 22nd Leg., 1st Sess. (Feb. 14, 2001) (comments of Representative Bunde); Minutes, Senate Judiciary Comm. Hearing on H.B. 13, 22nd Leg., 1st Sess. (Apr. 2, 2001) (comments of Representative Bunde).

[58]     *See* H.B. 13, 22nd Leg., 1st Sess. (2001).

District is a service area subject to its terms.[59]  Accordingly, we hold that the District is not a service area subject to the voting requirements of AS 29.35.450.

## IV.    CONCLUSION

We AFFIRM the superior court's grant of summary judgment.

---

[59]    L Street also raises a due process argument.  Under AMC 19.20.010(B) (1996), the District may be "extended only with the approval of the property owners who would bear more than 50 percent of the estimated cost of the improvement or service." L Street argues that "[s]o long as a sufficient number of property owners already in the District vote to expand the District, the District can be expanded regardless and in spite of the wishes of those in the area to be annexed."  We do not reach this constitutional argument because it is inapplicable here.  While the Assembly appears to have only examined the total number of petitions in favor of expanding and continuing the District rather than also looking at the subset of petitions from only those property owners within the proposed expansion, thirty properties in the expansion area with a total annual assessment of $89,057, or 56.8%, were in favor of the expansion.  Thus, a majority of business owners in the area affected by the proposed expansion voted in favor of expanding the District to include their properties.  L Street's argument is inapposite.